**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:        Justices:
Clifford W. Taylor    Michael F. Cavanagh
                      Elizabeth A. Weaver
                      Marilyn Kelly
                      Maura D. Corrigan
                      Robert P. Young, Jr.
                      Stephen J. Markman

FILED JULY 30, 2003

DAIMLERCHRYSLER CORPORATION,

        Petitioner-Appellee,

v                                      No. 133394

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

        Respondents-Appellees,

and

CITY OF AUBURN HILLS,

        Respondent-Appellant.

---

FORD MOTOR COMPANY,

        Petitioner-Appellee,

v                                      No. 133396

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

        Respondents-Appellees,

and

CITY OF DEARBORN,

    Intervening Respondent-
    Appellant.

_____

FORD MOTOR COMPANY,

    Petitioner-Appellee,

v                                        Nos. 133400-133402

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

    Respondents-Appellants,

and

CITY OF DEARBORN,

    Intervening Respondent-
    Appellee.

_____

DETROIT DIESEL CORPORATION,

    Petitioner-Appellee,
    Cross-Appellant,

v                                        No. 133403

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

    Respondents-Appellants,
    Cross-Appellees,

and

_____

CHARTER TOWNSHIP OF REDFORD,

Intervening Respondent-
Appellee.

---

FORD MOTOR COMPANY,

Petitioner-Appellee,

v                                                    No. 133404

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

Respondents-Appellants.

---

DAIMLERCHRYSLER CORPORATION,

Petitioner-Appellee,
Cross-Appellant,

v                                                    No. 133405

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

Respondents-Appellants,

and

TOWNSHIP OF SYLVAN,

Respondent-Appellee.

---

DAIMLERCHRYSLER CORPORATION,

Petitioner-Appellee,

3

v                                                No. 133406

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

           Respondents-Appellants,

and

CITY OF AUBURN HILLS,

           Respondent-Appellee.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

These consolidated appeals concern a tax exemption that aims to improve Michigan's environment by encouraging entities to reduce air pollution they create in Michigan. Based on the plain language of the statute, we hold that in order to for equipment to be exempt, it must be installed or acquired for the primary purpose of regulating or curbing the spread of pollution in Michigan. Further, the equipment must actually and physically limit pollution. None of the equipment that is the subject of this appeal meets these tests. Therefore, the Court of Appeals erred by partially overturning the decision of the Department of Environmental Quality (DEQ) and the State Tax Commission (STC) to that effect and holding that petitioners' test cells qualify for the exemption. We reverse the Court of Appeals in part and restore the DEQ and STC decisions concluding that none of the equipment qualifies for the tax exemption.

4

FACTS AND PROCEDURAL HISTORY

The material facts in these consolidated appeals are undisputed. Pursuant to federal law, before issuing a certificate allowing for sales of new vehicles, the Environmental Protection Agency (EPA) must "test or require to be tested" new motor vehicles or new motor vehicle engines to ensure compliance with emission standards that the EPA promulgates.[1] To that end, the agency has created a testing regime, requiring vehicle manufacturers to submit an application with an enormous amount of supporting data.[2] Ford Motor Company, DaimlerChrysler Corporation, and Detroit Diesel (petitioners) installed test cells. The test cells are large buildings that can replicate many temperature conditions. They also house equipment that allows for up to 40 different types of tests and data collection.[3] Petitioners' test cells are used in the manufacturing process to ensure compliance with the regulations. In addition to its test cell, Detroit Diesel installed a new engine production line to meet federal emissions regulations.

---

[1] 42 USC 7525(a)(1) and 7521.

[2] See 40 CFR 86.1 *et seq*.

[3] Narrative Statement attached to DaimlerChrysler Auburn Hills Application for Tax Exemption Certificate, July 14, 2003, pp 5-11. The Auburn Hills DaimlerChrysler test cell is similar to the test cells of the other petitioners. The individual specifications of each test cell do not control the disposition of this case. Therefore, this Auburn Hills DaimlerChrysler test cell summary can serve as a general example for purposes of analysis.

All the petitioners sought tax exemptions from the STC under part 59[4] of the Natural Resources and Environmental Protection Act (NREPA)[5] for their test cells, and Detroit Diesel also petitioned for an exemption for its engine line. Part 59 provides real and personal property tax exemptions, as well as sales and use tax exemptions for certain air pollution control facilities.[6] The law requires that the STC refer applications to the DEQ. The DEQ concluded that none of petitioners' equipment qualified for an exemption under part 59 because their primary purpose was not to reduce pollution, but to test products for compliance with federal emissions standards and to manufacture engines that comply with those standards. The DEQ also found that all the equipment actually generated some pollution during the testing or manufacturing processes, instead of physically disposing of air pollution or controlling it as the law requires. The STC agreed and denied all the exemptions. Petitioners appealed to various circuit courts. Ford's four exemption denials were reversed, while denials for DaimlerChrysler and Detroit Diesel were affirmed.

---

[4] MCL 324.5901 *et seq.*

[5] MCL 324.101 *et seq.*

[6] Ford had previously applied for and received a tax exemption under part 59 for its Allen Park test cell facility in 2001. While the applications involved in the instant action were pending in 2004, DEQ notified Ford that it was requesting revocation of its exemption for the Allen Park facility because the facility did not meet the requirements of part 59. The STC rejected the revocation, though, concluding that an exemption certificate under part 59 cannot be revoked. That exemption dispute is not before the Court.

6

The Court of Appeals granted the appellate applications of all the aggrieved parties and consolidated the cases on appeal. Its published opinion held that tax exemptions must be issued for all petitioners' test cells. The Court of Appeals concluded that the primary purpose of the test cells is to reduce pollution and that they need not physically or directly reduce pollution in order to qualify as tax-exempt. However, the Court of Appeals affirmed the denial of an exemption for Detroit Diesel's engine manufacturing line on the ground that its primary purpose was engine manufacturing, not pollution reduction. The Court also held that no due process violation occurred during the STC's consideration of Detroit Diesel's application for a tax exemption.[7] This Court granted leave to appeal.[8]

## STANDARD OF REVIEW

The Court reviews de novo motions for summary disposition.[9] Issues of statutory construction are also reviewed de novo.[10]

## ANALYSIS

The primary issue on appeal is whether the Court of Appeals erred in its application of the tax exemption of part 59 of NREPA. As noted, the Court of

---

[7] We agree with the Court of Appeals that the full hearing conducted by the STC satisfied Detroit Diesel's due process rights.

[8] 480 Mich 880 (2007).

[9] *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998).

[10] *City of Taylor v Detroit Edison Co*, 475 Mich 109, 115; 715 NW2d 28 (2006).

7

Appeals reached different conclusions for the petitioners' test cells and Detroit

Diesel's engine line. With regard to the test cells, the Court held

> [I]t is plainly apparent to us that the test cells were "installed or acquired for the primary purpose of controlling or disposing of air pollution" and that the test cells were designed and are operated "primarily for the control, capture, and removal of pollutants from the air, and [are] suitable, reasonably adequate, and meet[] the intent and purposes of part 55 . . . ."[11]

However, with regard to Detroit Diesel's engine line, the Court reached the

opposite conclusion, holding that "[c]learly, the engine line . . . is not 'operated

primarily for the control, capture, and removal of pollutants from the air . . . .'"[12]

While the Court of Appeals quoted language from the proper statutory

provisions, the Court did not offer a construction of that language. Instead, the

Court held that it was plain and clear which equipment was eligible and which was

not. As will be discussed later, the statutory provisions provide no principled

basis for distinguishing between the different equipment involved in this appeal.

Under the plain language of these provisions, neither the test cells nor the engine

line qualify for the exemption.

MCL 324.5901 defines "facility," in part, as

> machinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or disposing of air pollution that if

---

[11] *Ford Motor Co v State Tax Comm*, 274 Mich App 108, 113; 732 NW2d 591 (2007) (alterations in *Ford Motor*).

[12] *Id*. at 118.

released would render the air harmful or inimical to the public health or to property within this state.

An exemption for a particular "facility" requires a determination by the DEQ that "the facility is *designed and operated primarily for the control, capture, and removal of pollutants from the air*, and is suitable, reasonably adequate, and meets the intent and purposes of part 55[13] and rules promulgated under that part."[14]

Thus, the equipment must meet the requirements of both §§ 5901 and 5903 to qualify for the tax exemption. Section 5901's definition of "facility" expressly requires that the equipment be "installed or acquired for the primary purpose of *controlling* or *disposing of* air pollution . . . ." "Control" means to "exercise restraint or direction over; dominate, regulate, or command; to hold in check; curb."[15] "Dispose of" means "a. to deal with conclusively; settle. b. to get rid of; discard or destroy."[16]

The primary purpose of this equipment is to build engines (Detroit Diesel) or test engines (petitioners' test cells). The ancillary effect of the equipment is the control of pollution emitted by the engines. While the test cells help petitioners ensure that they are producing less polluting engines, the *primary* purpose of this equipment is not to regulate, curb the spread of, or destroy air pollution—and

---

[13] MCL 324.5501 *et seq.*

[14] MCL 324.5903 (emphasis added).

[15] *Webster's Universal College Dictionary* (1997).

[16] *Random House Webster's College Dictionary* (1997).

9

certainly not "pollution that if released would render the air harmful . . . to the public health or to property *within this state*."[17]  Instead, the primary purpose of the equipment is to *test* engines to ensure that petitioners have properly designed their engines to meet federal regulations so that they can sell them to consumers.[18] Furthermore, the equipment itself does not get rid of or curb air pollution.  Thus, petitioners' test cells are *not* "facilities" as defined by MCL 324.5901.

Even assuming that petitioners' federally required pollution equipment and Detroit Diesel's engine line qualify as "facilities," petitioners are still not entitled to an exemption because none of the equipment qualifies under § 5903.  Under that section, the DEQ must find "that the facility is *designed and operated*

---

[17] MCL 324.5901 (emphasis added).  The dissent is correct that the statute does not require that the equipment "solely" control pollution in Michigan. However, this equipment does not control *any* pollution in Michigan.  It is the engines and vehicles tested that emit less pollution.  While those vehicles may be sold in Michigan and may emit less pollution than other vehicles sold in Michigan, the *test cells* and Detroit Diesel's engine plant do not control any pollution in Michigan or any other state.

[18] The dissent misconstrues this statement to argue that this interpretation would render any equipment required by a federal regulation ineligible for the exemption.  Regardless of whether the federal government requires the installation of the pollution testing equipment, it is not a "facility" under this statute unless its primary purpose is pollution control or disposal.  For example, in *Covert Twp v State Tax Comm*, 407 Mich 561; 287 NW2d 895 (1980), federal law required that the petitioner install a containment device at its nuclear facility.  That equipment still qualified under the statute at issue because its primary purpose was to control pollution at the site in the case of an accident at the nuclear facility.  The primary purpose of the test cells and Detroit Diesel's engine plant is not control or disposal of pollution.  Therefore, regardless of whether federal law or "philanthropy" motivated petitioners to install the test cells or the engine plant, they do not qualify for the exemption.

10

primarily for the *control, capture, and removal* of pollutants from the air." There are a number of terms in this provision that need to be defined to properly construe it. The focus of the section is on the "design" and the "operation" of the facility. "Design" means "to intend for a definite purpose," while "operate" means "to work, perform, or function, as a machine does . . . to bring about, effect, or produce, as by action or the exertion of force or influence."[19] Thus, the facility must be intended to and bring about "the control, capture, and removal of pollutants from the air." "Control" has already been defined. "Capture" means "to gain control of or exert influence over," and "remove" means "to move or shift from a place or position; to eliminate; do away with or put an end to."[20] Because the Legislature used the conjunction "and," a qualifying facility must do all three things: curb, control, and eliminate pollution. Furthermore, the words suggest that the facility must actually and physically limit pollution. They do not stand for the proposition that the facility itself may contribute to the creation of a product that pollutes less than a similar product, which is what the equipment in this case does. Because the statutory language requires the *facility* to do the removing, controlling, and capturing of pollution, this equipment does not qualify.

The Court of Appeals held that the test cells qualified under § 5903 "because without the test cells, [petitioners] would not be able to ensure that their

---

[19] *Random House Webster's College Dictionary* (1997).
[20] *Id.*

11

*products* are adequately controlling, capturing, and removing pollutants from the air as compared to earlier versions of their vehicles and engines."[21]   This observation misses the mark.  The fact that the federal government may require such pollution control testing equipment has nothing to do with its eligibility for a tax exemption under Michigan law.  The dissent makes a similar analytic mistake, asserting that the test cells qualify because they "control" pollution "by regulating the emissions output" and "by curbing the levels of pollutants released into the air in the first place"; they "capture" pollution by "ensur[ing] that pollutants that would otherwise have been released into the atmosphere are never produced in the first place"; and they "remove" pollution "by preventing the pollutants from being created in the first place."[22]   The problem with both of these analyses is that the *test cells*, much like Detroit Diesel's engine line, are not the source of the removal, control, or capture of pollution as required by the exemption.  The testing process both produces and releases pollution contrary to the requirements of the statute.  The *design of the engine*, and the engine alone once put into manufacture and sold in a vehicle, accomplishes the removal, control, and capture of pollution because such an engine produces less pollution than other models.  Without the changes to the design of the engine, the test cells would accomplish nothing.  Because the statutory language requires the *facility* to do the removing, controlling, and

---

[21] *Ford Motor*, *supra* at 114 (emphasis added).

[22] *Post* at 18.

capturing, and the test cells and the pollution testing equipment in the engine plant do not remove, control, or capture pollutants, this equipment does not qualify for the tax exemption. Furthermore, none of the pollution control created by redesigned engines tested by petitioners is intended to improve the quality of *Michigan's* air. This fact does not trouble the Court of Appeals or the dissent, which must presume that our Legislature intended a gift from Michigan taxpayers to the nation by advancing national, rather than local, air quality goals.

Moreover, the Court of Appeals opinion does not directly address the requirement that a facility must "meet[] the intent and purposes of part 55" of NREPA.[23] A review of the other provisions in part 55 leaves little question that part 55 regulates the construction and operation of sources of air pollution, and

---

[23] The dissent asserts that the purpose of that part is the prevention and abatement of air pollution. In addition to being overly simplistic, this interpretation, when applied to MCL 324.5903, violates the rule of statutory construction that the Court should not interpret a statute in a way that renders part of it nugatory or mere surplusage. *Grimes v Dep't of Transportation*, 475 Mich 72, 89; 715 NW2d 275 (2006). MCL 324.5903 provides: "If the department finds that the facility is designed and operated primarily for the control, capture, and removal of pollutants from the air, and is suitable, reasonably adequate, and meets the intent and purposes of part 55 and rules promulgated under that part, the department shall notify the state tax commission, which shall issue a certificate." Thus, the statute requires that the "facility" control, capture, and remove pollutants *and* meet the intent and purposes of part 55. If the dissent is correct that the "intent and purposes" of part 55 are simply the reduction of pollution, then that requirement adds nothing to the first requirement. However, our interpretation that the "intent and purposes" of part 55 are the reduction of pollution at *stationary* sources adds something to the first requirement, namely a specific source of pollution that is to be targeted.

part 55 itself defines "source" as "a stationary source."[24] The dissent attempts to overcome this fact by focusing on the definition of "air pollution control equipment," MCL 324.5501(c), arguing that because that definition is arguably broad enough to encompass petitioners' test cells, the test cells must fall within the "intent and purposes of part 55." The dissent's analysis of the definition of "air pollution control equipment" must occur in a vacuum to reach its conclusion.[25]

---

[24] MCL 324.5501(t). The dissent decries our effort to ascertain the intent and purposes of part 55 by considering the whole of part 55. The dissent would prefer to look at one sentence of § 5540 of part 55 that supports the dissent's result to ascertain the intent and purposes of part 55.

The entirety of § 5540 is:

> It is the purpose of this part to provide additional and cumulative remedies to prevent and abate air pollution. This part does not abridge or alter rights of action or remedies now or hereafter existing. This part or anything done by virtue of this part shall not be construed as estopping persons from the exercise of their respective rights to suppress nuisances or to prevent or abate air pollution. [MCL 324.5540.]

The clear import of this section is that part 55 provides *additional remedies* to the existing remedies for the prevention or control of air pollution, namely private nuisance suits or citizen suits under MCL 324.1701. This section does not stand for the idea that the intent and purposes of part 55 are to control air pollution in all its forms and from any source, as the dissent asserts.

The dissent misconstrues the import of this discussion of § 5540. Unlike the dissent, we do not believe that the "intent and purposes" of part 55 are contained solely in § 5540. Instead, as noted, we believe that the *entirety* of part 55 should be considered to determine its "intent and purposes." Therefore, we think it is unnecessary "to explain how pollution-control facilities other than the test cells can provide 'additional remedies' that the test cells cannot." *Post* at 21.

[25] Similarly, the dissent has chosen the one subsection of MCL 324.5512(1) that references "mode[s] of transportation" to bolster its conclusion that the test cells meet the intent and purposes of part 55. Unfortunately, most of the subsections of MCL 324.5512(1) deal with "stationary sources" in accordance

(continued…)

14

The air pollution control equipment is only relevant to the control of pollution at "sources" and in "processes." A "process" is defined as "an action, operation, or a series of actions or operations *at a source* that emits or has the potential to emit an air contaminant." MCL 324.5501(p) (emphasis added). Therefore, the fact that, as the dissent argues, a test cell theoretically qualifies as "air pollution control equipment" is wholly irrelevant for purposes of part 55 because the test cell has no effect on air pollution at any source or in any process.

Part 55 provides for permitting, monitoring to ensure compliance, reporting, and imposing sanctions for violations. Notably, emissions from vessels and motor vehicles are covered in parts 61, 63, and 65. The inescapable conclusion is that part 55 serves to regulate air pollution from *stationary sources*, while air pollution from mobile sources is covered by other parts of NREPA. Nothing about the test cells affects air pollution from a stationary source; in fact, as stated, a test cell itself *adds* contaminants to the air in its location. If reduction of vehicle emissions qualifies as meeting the purpose of part 55, then the vehicles themselves would also qualify. Likewise, any auto repair shop could claim as

_____

(…continued)
with the "intent and purposes" of part 55. We are uncertain why the Legislature decided to confer rulemaking authority with regard to modes of transportation in part 55; however, we do not believe that this one subsection alters the fact that the "intent and purposes of part 55 and rules promulgated under that part" are to regulate air pollution from stationary sources. See Mich Admin Code, R 336.1101 *et seq*.

15

exempt any equipment it installed to test motor vehicle exhaust for excess pollution.

The Court of Appeals and the dissent simply fail to give meaning to part 55. In so doing, they have broadly construed this tax statute, contrary to the rule of construction that exemptions be narrowly construed against the taxpayer;[26] distorted the purpose of this tax statute; and awarded taxpayer money to business entities who fail to abate pollution in this state. In fact, the dissent actively conflates part 55 with the other parts of NREPA by concluding, "[a]s long as petitioners sell engines and vehicles in Michigan, thereby reducing harmful pollution in Michigan, the fact that they also sell engines and vehicles in other states, thereby reducing pollution in those states as well, does not prevent them from qualifying for the instant tax exemption."[27]

The two published opinions interpreting this part of NREPA support the conclusion that the exemption does not apply to petitioners' equipment. In *Meijer, Inc v State Tax Comm*,[28] the Court of Appeals held that a trash compactor and baler, which Meijer installed to replace an incinerator that polluted the air when burning trash from Meijer's grocery stores, was eligible for the tax exemption under MCL 336.1 (the predecessor to MCL 324.5901). In the second case, *Covert*

---

[26] See *Wexford Medical Group v City of Cadillac*, 474 Mich 192, 207; 713 NW2d 734 (2006), and *post* at 10-11.

[27] *Post* at 16 n 15.

[28] 66 Mich App 280; 238 NW2d 582 (1975).

*Twp Assessor v State Tax Comm*,[29] this Court upheld the STC's grant of a tax exemption to Consumers Power Company for a nuclear containment building at its nuclear power plant. Both of these cases concerned sources of pollution that would have been subject to the regulatory statutes of part 55.

This Court's decision in *Covert* interpreted "primary purpose" to mean "the primary purpose served by the facility for which [the] exemption is sought."[30] While the equipment in *Covert* was installed pursuant to federal law, this Court stated that the "purpose served" need not "align with the motivation of" those installing the facilities.[31] Nonetheless, the *statute* requires that the primary purpose be the control or disposal of air pollution. The equipment in *Covert* was installed to prevent the release of hazardous materials in the event of an accident at the petitioner's nuclear facility in this state. Therefore, the primary purpose was the control of air pollution in the event of an accident. That primary purpose qualified the equipment for the tax exemption.

Similarly, the "facility" in *Meijer*, a compactor and baler, actually served the primary purpose of controlling pollution in Michigan. The *Meijer* petitioner installed the compactor and baler to replace its incinerator because the incinerator produced pollution in excess of the amount allowed under the law. The compactor

---

[29] 407 Mich 561; 287 NW2d 895 (1980).

[30] *Id*. at 580.

[31] *Id.* at 580-581.

and baler accomplished the same task as the incinerator but by producing less pollution.[32]

Contrary to the Court of Appeals conclusion, the test cells are not analogous to the compactor and baler because the test cells did not replace a more polluting testing process. As noted by the *Meijer* panel, "had no pollution problem existed, and appellee simply chose the *method* of waste disposal by compacting and baling in order to dispose of waste, it would be ineligible for tax exemption because the necessary element—primary pollution control purposes— would be lacking."[33] The facilities in the instant case were installed for the primary purpose of testing engines, which will theoretically produce less pollution than other engines once put into production. However, petitioners simply chose a method of testing. They did not install the test cells to replace a process that accomplishes the same task with more pollution. Thus, the Court of Appeals and the dissent erroneously relied on *Meijer* to conclude that ancillary equipment

_____

[32] The dissent argues that under our interpretation of MCL 324.5901, the compactor and baler would not qualify as a facility because the equipment simply compresses or bales material. This argument misconstrues both our interpretation and the facts of *Meijer*. The *Meijer* petitioner had been disposing of its refuse with an incinerator that produced an abundance of pollution. As noted, the petitioner installed the compactor and baler for the primary purpose of controlling the air pollution produced by its refuse disposal system. Furthermore, when the compactor and baler were operated they actually "controlled, captured, and removed" pollutants at that site. The test cells simply do not perform these functions. Any reduction of pollution that is connected to the test cells is entirely contingent on the redesign and manufacture of the engines and vehicles that may be introduced for future sales across the country.

[33] *Meijer*, *supra* at 285.

installed primarily for the purpose of *testing* other equipment also qualifies for the exemption.

The clear import of these cases and the statute is that the "facility" must reduce the air pollution caused by the *operation* of the petitioner's Michigan site to qualify for the tax exemption. However, the dissent argues that the reduction of air pollution caused by the petitioner's engine products—well after those products have left the petitioner's control—can qualify the testing equipment used to manufacture those products for the exemption. This interpretation expands the exemption statute far beyond its plain meaning and contrary to any rationale that our Legislature entertained for affecting this state's environment.

CONCLUSION

In denying DaimlerChrysler's application for its Auburn Hills test cell, the DEQ listed the following "Non-Air Pollution Function(s) of Equipment": "The testing of vehicles is one of the manufacturing steps that the applicant takes in researching, designing, manufacturing, testing, marketing and selling vehicles."[34] In the "comments" section, the DEQ states:

> Testing vehicles at the Chrysler Technical Center actually generates and emits air contaminants. None of the requested equipment controls, capture [sic] or removes pollutants generated by the vehicle testing equipment. The applicant has not satisfied its burden of establishing that its described machinery, equipment, structures, or related accessories were installed or acquired and

---

[34] DEQ Tax Exemption Review, December 15, 2003. The DEQ reached the same conclusion with regard to the other petitioners' test cells.

19

designed and operated to physically control, dispose, capture, and/or remove air pollutants from the air, that if released would render the air harmful, pursuant to the intent of Sections 5901 and 5903 of Part 59, as separate and distinct from apparent other purposes of measuring, recording and assessing data to determine if a product is fit for continued production or commercial sales, or for other research, manufacturing, marketing or sales purposes. The Department finds that the applicant has not established a primary purpose qualifying for a tax exemption under Part 59.[35]

The DEQ properly applied §§ 5901 and 5903 and concluded that the test cells do not qualify for a tax exemption. Therefore, we reverse the Court of Appeals and reinstate the STC's decision denying petitioners' request for tax exemptions for their test cells. However, we affirm the Court of Appeals holding that the Detroit Diesel Equinox Line was not entitled to a tax exemption and that Detroit Diesel received due process.

> Robert P. Young, Jr.
> Clifford W. Taylor
> Michael F. Cavanagh

---

[35] *Id.*

STATE OF MICHIGAN

SUPREME COURT


DAIMLERCHRYSLER CORPORATION,

> Petitioner-Appellee,

v                                                    No. 133394

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

> Respondents-Appellees,

and

CITY OF AUBURN HILLS,

> Respondent-Appellant.

_____


FORD MOTOR COMPANY,

> Petitioner-Appellee,

v                                                    No. 133396

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

> Respondents-Appellees,

and

CITY OF DEARBORN,

> Intervening Respondent-
> Appellant.

_____

FORD MOTOR COMPANY,

        Petitioner-Appellee,

v                                          Nos. 133400-133402

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

        Respondents-Appellants,

and

CITY OF DEARBORN,

        Intervening Respondent-
        Appellee.

_____

DETROIT DIESEL CORPORATION,

        Petitioner-Appellee,
        Cross-Appellant,

v                                          No. 133403

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

        Respondents-Appellants,
        Cross-Appellees,

and

CHARTER TOWNSHIP OF REDFORD,

        Intervening Respondent-
        Appellee.

_____

FORD MOTOR COMPANY,

       Petitioner-Appellee,

v                                         No. 133404

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

       Respondents-Appellants.

_____

DAIMLERCHRYSLER CORPORATION,

       Petitioner-Appellee,
       Cross-Appellant,

v                                         No. 133405

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

       Respondents-Appellants,

and

TOWNSHIP OF SYLVAN,

       Respondent-Appellee.

_____

DAIMLERCHRYSLER CORPORATION,

       Petitioner-Appellee,

v                                         No. 133406

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

3

Respondents-Appellants,

and

CITY OF AUBURN HILLS,

Respondent-Appellee.

_____

KELLY, J. (*concurring in the result*).

Justice Young and Justice Weaver disagree about whether the test cells at Ford Motor Company, DaimlerChrysler Corporation, and Detroit Diesel Corporation are entitled to tax-exemption certificates. The justices reasonably apply the statutory language, but reach opposite conclusions. In this situation, judicial construction should be brought to bear to resolve the issue. When the applicable canon of interpretation is applied, it becomes apparent that the test cells are not entitled to tax-exemption certificates. Thus, although I disagree with some of his reasoning, I concur in the result of Justice Young's opinion.

In addition, I agree with both Justice Weaver and Justice Young that the Detroit Diesel Corporation engine production equipment is not entitled to a tax-exemption certificate. Finally, I agree that the corporation received a full hearing before the STC that satisfied its due process rights.

THE TWO-PART TEST OF NREPA

The issue that divides Justice Young and Justice Weaver is whether the test cells qualify for tax-exemption certificates under part 59 of the Natural Resources

4

and Environmental Protection Act (NREPA).[1]  For purposes of this case, the key provisions of part 59 are §§ 5901 and 5903.  Section 5901 sets forth the definition of "facility."  It provides in relevant part:

> As used in this part, "facility" means machinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or disposing of air pollution that if released would render the air harmful or inimical to the public health or to property within this state. . . .

Section 5903 explains when a "facility" is entitled to a tax-exemption certificate.  It states:

> If the department finds that the facility is designed and operated primarily for the control, capture, and removal of pollutants from the air, and is suitable, reasonably adequate, and meets the intent and purposes of part 55 and rules promulgated under that part, the department shall notify the state tax commission, which shall issue a certificate. The effective date of the certificate is the date on which the certificate is issued.

Using these statutes, a two-part test must be applied to determine whether the test cells are entitled to tax-exemption certificates.  First, the test cells must qualify as a "facility" under § 5901.  Second, the "facility" must meet the additional requirements set forth in § 5903.

SECTION 5901

With respect to the first consideration, the test cells are facilities if they are (1) machinery, equipment, structures, or any part or accessories of machinery, equipment, or structures and (2) installed or acquired for the primary purpose of

---

[1] MCL 324.5901 *et seq.*

5

controlling or disposing of air pollution (3) that if released would render the air harmful or inimical to the public health or to property within this state. It is uncontested that the test cells are machinery, equipment, or structures. The dispute is over the other two statutory requirements.

Respondents argue that the test cells were not installed or acquired for the primary purpose of controlling or disposing of air pollution. I disagree. Petitioners installed the test cells solely to comply with pollution laws. The test cells have no other purpose. Were it not for pollution laws, petitioners could build their products without the need for test cells. In fact, it would be cheaper for them to do so. Thus, it seems clear to me that the primary purpose of installing test cells was to control air pollution.

Respondents also argue that the test cells do not qualify as facilities because their primary purpose is not to control or dispose of pollution within Michigan. I reject this argument because the statute does not require that the primary purpose of the equipment be to improve air quality in Michigan. Instead, the statutory command is satisfied if the pollution that the equipment is concerned with controlling or disposing of, if released, would "render the air harmful or inimical to the public health or to property within this state." The command is satisfied here. If the pollutants that the test cells are concerned with controlling were released into the air, they would be harmful to the public health and property within the state.

6

Finally, respondents argue that the test cells are not facilities because they create a small amount of pollution. This fact is irrelevant. The test cells are facilities if their primary purpose is controlling or disposing of pollutants that, if released, would be harmful to the public health and property within this state. These requirements are satisfied.

SECTION 5903

The next step of the inquiry is to determine if the test-cell facilities meet the requirements of § 5903. A facility is entitled to a tax-exemption certificate under this section if it is (1) designed and operated primarily for the control, capture, and removal of pollutants from the air, (2) suitable, reasonably adequate, and (3) meets the intent and purposes of part 55 of the act.

Notably, § 5903 requires the "facility" to be "designed and operated primarily for the control, capture, *and* removal of pollutants from the air." This differs from § 5901, which requires the test cells to be "installed or acquired for the primary purpose of controlling *or* disposing of air pollution." It must be assumed that this difference in wording is purposeful. As a result, § 5903 imposes a more stringent requirement than § 5901. Accordingly, it does not follow from the fact that the test cells qualify as "facilities" that they are "designed and operated primarily for the control, capture, *and* removal of pollutants from the air."

The test cells do not actually remove pollution that is already in the air. Instead, they are part of a process that reduces the amount of pollution in the air by

7

preventing the creation of pollutants. Because the test cells are not concerned with pollutants that are already in the air, it can be argued that the test cells are not "designed and operated primarily for the control, capture, and *removal of pollutants from the air*." There is some merit to this argument. Accordingly, I believe that it is reasonable to decide that the test cells do not qualify for tax-exemption certificates. This is the result reached by Justice Young.

On the other hand, the test cells are operated solely in an effort to comply with federal pollution standards. By complying with these standards, the quantity of pollutants in the air is reduced. Considering that the test cells are part of a process that eliminates the creation of pollutants, they remove pollutants that would otherwise be in the air. The statute does not explicitly require the facility to remove pollutants that are already in the air. Hence, I believe that it is also reasonable to decide that the facilities are entitled to tax-exemption certificates. Justice Weaver reaches this conclusion.

Because I believe that both Justice Young's and Justice Weaver's constructions of the statute are reasonable, I conclude that the correct application of the statute to the facts of this case is uncertain. As a consequence, the statute is ambiguous.[2] The remaining provisions of NREPA do not clarify this ambiguity.

---

[2] A statute is ambiguous when its application to the facts of the case is uncertain. *Elias Bros Restaurants, Inc v Treasury Dep't*, 452 Mich 144, 150; 549 NW2d 837 (1996).

Accordingly, I conclude that it is appropriate to turn to sources outside the statutory language to resolve the case.

THE EFFECT OF DEQ RULINGS AND CASELAW

Both sides claim that the rule that deference is owed to administrative interpretations supports their position. The Department of Environmental Quality (DEQ), which is authorized to determine eligibility for part 59 tax exemptions, decided that the test cells at issue are not entitled to tax-exemption certificates. However, this decision is inconsistent with at least one recent DEQ decision that granted a tax-exemption certificate to a test-cell facility. Accordingly, because the DEQ's current interpretation is inconsistent with another of its recent interpretations, it does not weigh heavily in favor of either position.

The parties also identify prior published court opinions interpreting part 59 as supporting their positions. But these opinions do not resolve the present case. In *Covert Twp Assessor v State Tax Comm*,[3] the facilities at issue controlled, captured, and removed discharges resulting from a nuclear accident.[4] Accordingly, the facilities' primary concern was with pollutants that had already been created. This differs from the test cells involved here that have a goal of preventing pollutants from ever being created. Thus, that case is not on point because the facts were materially different. The other case, *Meijer, Inc v State Tax*

---

[3] *Covert Twp Assessor v State Tax Comm,* 407 Mich 561; 287 NW2d 895 (1980).

[4] *Id.* at 580.

9

*Comm*,[5] is also not directly on point. Furthermore, it is a Court of Appeals decision. As such, it is not binding on this Court.

Finally, we are directed to decisions of other states interpreting their tax-exemption statutes. Given that these cases involve statutes that differ from Michigan's statutes, I find them of little assistance in determing the proper interpretation of the Michigan statute.

THE CANONS OF STATUTORY CONSTRUCTION

Because I cannot resolve the issue using the statute's language alone and the other sources I have mentioned do not point in either direction, I turn to the canons of construction. Most applicable is the well-established canon that tax exemptions are to be strictly construed.[6] When this canon is applied, test-cell facilities are exempt from taxation only if the statutory language does not allow another construction. But another construction is not only possible, but reasonable. As a result, I conclude that the test cells are not entitled to tax-exemption certificates.

CONCLUSION

I conclude that the test cells qualify as facilities under § 5901, but that the correct application of § 5903 is unclear. DEQ rulings and existing caselaw are not

---

[5] *Meijer, Inc v State Tax Comm,* 66 Mich App 280; 238 NW2d 582 (1975).

[6] See, e.g., *East Saginaw Mfg Co v East Saginaw*, 19 Mich 259, 279 (1869); *Michigan United Conservation Clubs v Lansing Twp*, 423 Mich 661, 664; 378 NW2d 737 (1985).

dispositive of the issue.  As a result, I engage in judicial construction to determine whether the facilities are entitled to tax-exemption certificates.

The appropriate canon of construction is that tax exemptions are to be strictly construed.  By strictly construing the exemption in question, I conclude that the test-cell facilities are not entitled to tax-exemption certificates.  As a consequence, I concur with Justice Young's resolution of this issue.  I also agree that Detroit Diesel's engine line is not eligible for the tax exemption.  Therefore, I agree with Justice Young that the Court of Appeals decision should be partially affirmed and partially reversed.


Marilyn Kelly


11

STATE OF MICHIGAN

SUPREME COURT

DAIMLERCHRYSLER CORP,

       Petitioner-Appellee,

v                            No. 133394

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

       Respondents-Appellees,
and

CITY OF AUBURN HILLS,

       Respondent-Appellant.

_____

FORD MOTOR COMPANY,

       Petitioner-Appellee,

v                            No. 133396

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

       Respondents-Appellees,

and

CITY OF DEARBORN,

       Intervening Respondent-
       Appellant.

_____

FORD MOTOR COMPANY,

        Petitioner-Appellee,

v                                                    No. 133400-02

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

        Respondents-Appellants,
and

CITY OF DEARBORN,

        Intervening Respondent-
Appellee.

---

DETROIT DIESEL CORPORATION,

        Petitioner-Appellee/Cross-
        Appellant,

v                                                    No. 133403

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

        Respondents-Appellants/Cross-
        Appellees,
and

CHARTER TOWNSHIP OF REDFORD,

        Intervening Respondent-
Appellee.

---

FORD MOTOR COMPANY,

        Petitioner-Appellee,

v                                    No. 133404

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY

        Respondent-Appellants,

---

DAIMLERCHRYSLER CORPORATION,
        Petitioner-Appellee/Cross-
          Appellant,

v                                    No. 133405

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

        Respondents-Appellants,
and

TOWNSHIP OF SYLVAN,

        Respondent-Appellee.

---

DAIMLERCHRYSLER CORPORATION,
        Petitioner-Appellee,

v                                    No. 133406

STATE TAX COMMISSION and
DEPARTMENT OF ENVIRONMENTAL
QUALITY,

3

Respondents-Appellants,
and

CITY OF AUBURN HILLS,

Respondent-Appellee.

WEAVER, J. (*concurring in part and dissenting in part*).

I concur with the lead opinion's holding that Detroit Diesel's Equinox Line does not qualify for tax exemptions under part 59 of the Natural Resources and Environmental Protection Act (NREPA)[1] because the Equinox Line was not installed for the primary purpose of controlling or disposing of air pollution, but was instead installed for the primary purpose of producing a new type of vehicle engine for sale. However, I dissent from the lead opinion's holding that petitioners' test-cell facilities do not qualify for tax exemption under part 59. I would affirm the Court of Appeals and hold that petitioners' test-cell facilities qualify for tax exemptions under part 59 because they meet the definition of "facility" in MCL 324.5901 and, under MCL 324.5903, are "designed and operated primarily for the control, capture, and removal of pollutants from the air," are "suitable" or "reasonably adequate" at abating air pollution, and "meet the intent and purposes of part 55" of NREPA, MCL 324.5501 *et seq.*, which regulates air pollution.

---

[1] MCL 324.5901 *et seq.*

4

## I. FACTS AND PROCEEDINGS

The material facts in these seven consolidated cases are undisputed. Petitioners, Ford Motor Company, DaimlerChrysler, and Detroit Diesel, manufacture motor vehicles and engines. Petitioners' vehicles and engines are subject to federal air-quality regulations promulgated by the Environmental Protection Agency (EPA).[2] The vehicles and engines must pass EPA-mandated emissions tests before the vehicles and engines can be mass-produced and sold to consumers. Each of the petitioners established "test cell" facilities designed to test vehicle and engine emissions to ensure compliance with EPA regulations. In the test cells, vehicles and engines are placed in a closed room or a bay with a hose attached to the exhaust pipe. While the vehicle or engine is emitting exhaust, samples of the exhaust are sent through devices that measure the emissions and determine whether those emissions comply with federal regulations. The test cells then release the tested emissions into the air.

In addition to a test-cell facility, Detroit Diesel built its Equinox Line facility after its existing Series 60 diesel engine failed to meet the newly enacted EPA emission standards. The Equinox Line facility was designed to manufacture new diesel engines that meet the newest federal pollution-control standards. In October 2002, after Detroit Diesel made significant design changes to the original

---

[2] See 42 USC 7401 *et seq.*

5

Series 60 engine, Detroit Diesel's new Equinox Line of diesel engines obtained EPA certification.

In 2001, Ford Motor Company filed for tax exemptions for test cells and equipment under part 59 of NREPA,[3] which permits tax exemptions for certain facilities that reduce air pollution. This application was granted by the State Tax Commission (STC) after review and approval by the Michigan Department of Environmental Quality (DEQ). In 2003 and 2004, Ford, DaimlerChrysler, and Detroit Diesel filed for multiple exemptions under part 59 for similar test-cell facilities located around the state. Additionally, in 2003 Detroit Diesel applied for tax exemptions for its Equinox Line facility. The STC referred the exemption requests to the DEQ, which concluded that the test-cell facilities and the Equinox Line facility did not meet the requirements for a part 59 tax exemption.

The DEQ concluded that the primary purpose of the test cells was to enable petitioners to sell their vehicles by complying with federal law, not to reduce pollution. The DEQ explained that the test cells did not qualify for the exemption because they did not physically remove or control pollution, but rather actually created pollution during the testing process. In regard to Detroit Diesel's Equinox Line, the DEQ determined that it was not a qualifying facility under part 59 because its primary purpose was "to manufacture diesel engines for sale by Detroit Diesel." The DEQ determined that because the air emissions from the Equinox

_____

[3] MCL 324.5901 *et seq*.

6

Line manufacturing facility were not significantly different from those emitted by the Series 60 facility, the Equinox Line did not qualify as a "process change" under part 59 that met the goal of reducing pollution. As a result, the STC rejected the tax exemption requests for the test-cell facilities and the Equinox Line facility.

In separate lawsuits, petitioners appealed to various circuit courts. In Ford's suits, the Wayne Circuit Court reversed the STC's denials of the tax-exemption applications, ruling that the court was constrained by *Meijer, Inc v State Tax Comm*, 66 Mich App 280; 238 NW2d 582 (1975), to conclude that the test-cell facilities met the part 59 requirements because they were ancillary equipment for the control of pollution. The city of Dearborn, an intervening respondent, filed four separate applications in the Court of Appeals, arguing that the circuit court had improperly overturned fact-finding of the administrative agency.

In Detroit Diesel's suit, the Wayne Circuit Court affirmed the STC's decision because there was competent, material, and substantial evidence supporting the STC's conclusion that the test cells and the Equinox Line do not actually remove pollution, but rather operate for the primary purpose of producing engines for sale. Detroit Diesel applied for leave to appeal in the Court of Appeals.

In DaimlerChrysler's suits, the Oakland Circuit Court affirmed the STC's decisions, holding that there was competent, material, and substantial evidence for the STC's conclusion that the test cells do not actually remove pollution and that

7

the primary purpose for the test cells was to ensure that DaimlerChrysler's vehicles were sellable. DaimlerChrysler applied for leave to appeal in the Court of Appeals.

The Court of Appeals issued an order consolidating all the appeals. The Court of Appeals, in a published opinion, held that all the test-cell facilities met the requirements of the part 59 tax exemption as a matter of law, but that Detroit Diesel's Equinox Line facility did not.[4] The panel concluded that the test cells qualified for tax-exemption certificates because petitioners installed the test cells solely to ensure compliance with EPA emission standards. Thus, the test cells were installed for the primary purpose of controlling or disposing of air pollution and were designed and operated primarily for the control, capture, and removal of pollutants from the air. The panel held that Detroit Diesel's Equinox Line did not meet the requirements of part 59 because it was operated primarily for production of a new type of engine for sale, not for the control, capture, or removal of pollutants in the air. The Court of Appeals also rejected Detroit Diesel's claims that the STC's hearing process violated the Administrative Procedures Act (APA), MCL 24.201 *et seq.*, and due-process principles.

The DEQ and the STC filed separate applications for leave to appeal in each case. Detroit Diesel cross-appealed. The city of Auburn Hills appealed the

---

[4] *Ford Motor Co v State Tax Comm*, 274 Mich App 108; 732 NW2d 591 (2007).

8

decision regarding DaimlerChrysler's Auburn Hills test cell, and the city of Dearborn appealed the decision involving Ford's Dearborn test cell. This Court granted all the applications for leave to appeal or cross-appeal.[5]

## II. STANDARD OF REVIEW

This case involves the interpretation of part 59 of NREPA. This Court reviews questions of statutory interpretation de novo.[6] Clear and unambiguous statutory language is given its plain meaning and is enforced as written.[7]

Further, this case involves review of the STC and DEQ's interpretation and application of part 59. This Court reviews final decisions from administrative agencies by determining whether they are authorized by law and whether they are supported by competent, material, and substantial evidence on the whole record.[8] Although this Court affords respectful consideration to the construction of statutory provisions by any particular department of the government, the department's interpretation is not binding on this Court and cannot be used to

---

[5] *DaimlerChrysler Corp v State Tax Comm*, 480 Mich 880 (2007).

[6] *Ayar v Foodland Distributors*, 472 Mich 713, 715; 698 NW2d 875 (2005).

[7] *Id.* at 716.

[8] *Reed v Hurley Medical Ctr,* 153 Mich App 71, 75; 395 NW2d 12 (1986); MCL 24.306.

9

overcome the statute's unambiguous meaning.[9]  Furthermore, this Court owes no

deference to an agency determination when an agency issues contradictory rulings

on the same issue and changes its policy mid-course, as the DEQ has in this case.

"'Substantial evidence' is evidence that a reasonable person would accept as

sufficient to support a conclusion.  While this requires more than a scintilla of

evidence, it may be substantially less than a preponderance."[10]

## III. PART 59 TAX EXEMPTIONS

Part 59 of NREPA provides real property, personal property, sales, and use

tax exemptions for certain facilities designed to reduce air pollutants.  Tax

---

[9] *Catalina Marketing Sales Corp v Dep't of Treasury*, 470 Mich 13, 23-24; 678 NW2d 619 (2004).

[10] *Dep't of Community Health v Risch*, 274 Mich App 365, 372-373; 733 NW2d 403 (2007) (citation and quotation marks omitted).  The city of Dearborn argues in its application that the STC's decision to deny Ford's application for a tax exemption was supported by competent, material, and substantial evidence on the record and should therefore not be disturbed on appeal.  We reject this argument because it is based on the incorrect assumption that the circuit court reversed the STC on a purely factual basis, instead of a legal one.  On appeal, the Court of Appeals did not consider whether the STC's decision to deny Ford's application for a tax exemption was unsupported by factual evidence.  Rather, the Court of Appeals held that the STC's legal rulings were erroneous as a matter of law.  Under MCL 24.306 of the APA, a reviewing court can set aside the STC's decision on a legal basis *or* on a factual basis if the facts are not supported by competent, material, and substantial evidence.  Therefore, the Court of Appeals was free to rule that the STC's decision was legally erroneous, even if it was supported by competent, material, and substantial evidence.

exemptions are strictly construed against the taxpayer.[11] However, the Court interprets the statutory language creating the tax exemption according to common and approved usage.[12] In order to qualify for the tax exemptions under part 59, the property in question must first meet the definition of "facility" in part 59. Part 59 defines "facility" as follows:

> [M]achinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, *installed or acquired for the primary purpose of controlling or disposing of air pollution* that if released would render the air harmful or inimical to the public health or to property *within this state*. Facility includes an incinerator equipped with a pollution abatement device in effective operation. Facility does not include an air conditioner, dust collector, fan, or other similar facility for the benefit of personnel or of a business. Facility also means the following, if the installation was completed on or after July 23, 1965:
>
> (a) Conversion or modification of a fuel burning system to effect air pollution control. The fuel burner portion only of the system is eligible for tax exemption.
>
> (b) Installation of a new fuel burning system to effect air pollution control. The fuel burner portion only of the system is eligible for tax exemption.
>
> (c) *A process change involving production equipment made to satisfy the requirements of part 55 and rules promulgated under that part.* The maximum cost allowed shall be 25% of the cost of the new process unit but shall not exceed the cost of the conventional control equipment applied on the basis of the new process production rate on the preexisting process. [MCL 324.5901 (emphasis added).]

---

[11] *Elias Bros Restaurants, Inc v Dep't of Treasury*, 452 Mich 144, 150; 549 NW2d 837 (1996).

[12] *Id*.

11

After property has been designated as a facility under MCL 324.5901, the facility must meet the following further requirements in order to qualify for tax exemptions:

> If the department finds that the facility is designed and operated primarily for the control, capture, and removal of pollutants from the air, and is suitable, reasonably adequate, and meets the intent and purposes of part 55 and rules promulgated under that part, the department shall notify the state tax commission, which shall issue a certificate. . . . [MCL 324.5903.]

Therefore, property must meet the definition of "facility" under MCL 324.5901, *and*, under MCL 324.5903, (1) be "designed and operated primarily for the control, capture, and removal of pollutants from the air," (2) be "suitable, reasonably adequate," and (3) "meet the intent and purposes of part 55" in order to qualify for tax exemptions under part 59.

## A. *TEST-CELL FACILITIES*

I dissent from the lead opinion, and would hold that the petitioners' test-cell facilities qualify for tax exemptions under part 59. In order to determine whether the petitioners' test-cell facilities qualify for tax exemptions, it is necessary to first determine whether the test-cell facilities are "facilities" under MCL 324.5901. MCL 324.5901 unambiguously defines a facility as including "machinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, *installed or acquired for the primary purpose of controlling or disposing of air pollution* that if released would render the air harmful or inimical to the public health or to property within this state." (Emphasis added.)

12

Accordingly, it is necessary to determine whether the test cells were installed or acquired for the primary purpose of controlling or disposing of air pollution in Michigan. An ordinary meaning of "control" means to "exercise restraint or direction over; dominate, regulate, or command; to hold in check; curb."[13] It is undisputed that petitioners installed and operated the test cells for the sole purpose of regulating emissions to meet federal standards and curb emissions output in the engines and vehicles produced. Regulating and curbing emissions is thus a method of controlling emissions.

The STC and the DEQ argue that petitioners did not install the test cells with the primary motive of controlling emissions because the test cells were installed to create vehicles conforming to EPA regulations. However, the petitioners' motive behind installing the test cells is not determinative of the primary purpose of the test cells. It is immaterial that the test cells were created so that the petitioners' engine and vehicle emissions would satisfy federal emissions regulations:

> The use of the words "primary purpose" in § 1 [now MCL 324.5901], and "operated primarily for" in § 3 [now MCL 324.5903] of the Air Exemption Act [now part 59] evidences a legislative concern with the primary purpose served by the facility for which exemption is sought. This purpose need not, necessarily, align with

---

[13] *Webster's Universal College Dictionary* (1997).

13

the motivation of the persons installing, acquiring or operating the facilities.[14]

The test cells primarily operate to regulate and reduce air pollutants; for tax-exemption purposes, it does not matter why the test cells were implemented.

The STC and the DEQ additionally argue that the test-cell facilities are not "facilities" under MCL 324.5901 because the test-cell facilities actually create a small amount of pollution through the testing process. This creation of a small amount of pollution does not, however, alter the primary purpose of the test cells, which is to control pollution through prevention. As petitioners point out, many pollution-control machines also create pollution. For example, mechanical balers and compactors, such as those in *Meijer, supra,* release some exhaust during recycling operations.

The STC and the DEQ also argue that the clause "within this state" in MCL 324.5901 bars tax exemption for petitioners because the exhaust emissions that the test cells reduce are released primarily outside Michigan. This argument is unpersuasive. First, the STC and the DEQ did not preserve this issue for appeal because they did not raise and argue it before the Court of Appeals. Furthermore, the phrase "within this state" modifies the conjoined phrases "to the public health or to property," not "the primary purpose of controlling air pollution." In other words, the statute merely requires that the "primary purpose" of the machinery

---

[14] *Covert Twp Assessor v State Tax Comm*, 407 Mich 561, 580-581; 287 NW2d 895 (1980).

installed be to "control . . . air pollution," not to specifically control air pollution that would be released primarily within this state, as the STC and the DEQ argue. The statute then refines the category of "air pollution" to refer to a subcategory of pollution "that if released would render the air harmful or inimical to the public health or to property within this state." This phrase indicates that *if* the pollution that has been controlled were to be released, that pollution must be of the type that would be harmful to public health or property in Michigan in order for machinery that controls such air pollution to qualify as a "facility." Thus, if the test cells at issue were installed for the primary purpose of controlling air pollution, and if the release of the controlled air pollution would render the air harmful to public health or property within Michigan, then the test cells qualify as a "facility." Here, the primary purpose of the test cells is to reduce air pollution by testing the emissions released by vehicles. Moreover, there is no question that vehicles and engines manufactured by the petitioners are sold in Michigan, and that the pollution controlled by the test cells is harmful to the public health. It stands to reason then that the vehicles and engines sold in Michigan emit fewer noxious pollutants into Michigan's atmosphere than they would have released without the test cells. Therefore, the test cells control air pollution that, if released, "would render the air harmful or inimical to the public health or to property within this state." Accordingly, the test cells are "facilities" under MCL 324.5901.[15]

---

[15] MCL 324.5901 does not require that pollution be reduced *solely* within

(continued…)

15

Petitioners' test-cell facilities were installed or acquired for the primary purpose of controlling or disposing of air pollution in Michigan because the test cells curb the spread of air pollution by ensuring that less pollution is released into the atmosphere in the first place; therefore, the test-cell facilities are "facilities" under MCL 324.5901.

The lead opinion argues that the test cells are not "facilities" because their primary purpose is to "*test* engines to ensure that petitioners have properly designed their engines to meet federal regulations so that they can sell them to consumers." *Ante* at 10. However, this argument does not consider that without the federally mandated pollution regulations, petitioners would not need or have test cells, but would continue to operate without them. As petitioners point out, the test cells do not benefit petitioners' businesses because conformance with EPA regulations increases expenses, resulting in higher vehicle and engine prices and reduced sales. Thus, the test cells were not installed to foster sales. Further, *every* business must comply with federal pollution regulations and *every* business is trying to sell something. Under the lead opinion's interpretation, it appears that any business that complies with federal regulations is not entitled to a Michigan tax exemption because it could always be said that the business complied with

_____

(…continued)
Michigan. As long as petitioners sell engines and vehicles in Michigan, thereby reducing harmful pollution in Michigan, the fact that they also sell engines and vehicles in other states, thereby reducing pollution in those states as well, does not prevent them from qualifying for the instant tax exemption.

16

federal regulations merely to sell its product to consumers. Under the lead opinion's interpretation, the only way a business would be entitled to a tax exemption is by philanthropically installing pollution-control equipment.

The test cells perform a fundamental function in the air-pollution-control process. They measure the levels of pollution emitted by engines in order to assure compliance with air-pollution regulations. If these levels of pollution exceed limits, the engines are not manufactured or sold, thereby curtailing excessive air pollution. Without the test cells, petitioners would be unable to ensure that their products are less polluting. Because testing emissions is an essential component of "controlling or disposing of air pollution," and because the test cells were installed specifically to test pollution, the test cells can fairly be characterized as having been installed for "the primary purpose of controlling or disposing of air pollution" under MCL 324.5901. Moreover, under the lead opinion's analysis, even compactors or balers, which were specifically held to qualify as "facilities" in *Meijer*, *supra* at 284, a decision with which the lead opinion apparently agrees, *ante* at 17-18, would not qualify as such because their "primary purpose" is to *compress or bale* material, rather than to "control" pollution.

Next, in order to qualify for tax exemptions under part 59, petitioners' test-cell facilities must meet the requirements of MCL 324.5903. First, the test cells must be designed and operated primarily for the control, capture, and removal of

17

pollutants from the air. In this case, the test cells were created for the sole purpose of reducing air pollutants emitted by the petitioners' vehicles and engines, so that is the cells' primary purpose.

As discussed earlier, the test cells control air pollutants directly by regulating the emissions output, and indirectly by curbing the levels of pollutants released into the air in the first place. The test cells also capture and remove pollutants from the atmosphere. An ordinary meaning of "capture" is "to gain control of or exert influence over."[16] Again, by regulating and curbing emissions, the test cells ensure that pollutants that would otherwise have been released into the atmosphere are never produced in the first place and thus control pollutants. An ordinary meaning of "remove" is "to move or shift from a place or position; to eliminate; do away with or put an end to."[17] The test cells "eliminate" or "put an end to" air pollutants by preventing the pollutants from being created in the first place; were it not for the test cells, the abated pollutants would be in the atmosphere. Thus, the test cells operate primarily for the control, capture, and removal of air pollutants from the air.

Next, the test cells must be suitable and reasonably adequate for the purpose of reducing air pollutants and must also meet the intent and purposes of part 55 of NREPA to qualify for tax exemptions. "The suitability and

---

[16] *Random House Webster's College Dictionary* (1997).

[17] *Id.*

adequacy . . . can be, and are, measured and tested through non-empirical studies based on accepted scientific principles and sound analysis. . . . [T]he resolution of this question is particularly well-suited to the expertise of the administrative agencies charged with assessing the technical suitability and adequacy of facilities for which exemption is sought."[18]  It is undisputed that the test cells function to help petitioners reduce and regulate the air pollutants that their vehicles and engines ultimately emit in order to meet federal standards.  As a result, the test cells are suitable and reasonably adequate for the purpose of reducing noxious air pollutants.

The purpose of part 55, by its own terms, is "to provide additional and cumulative remedies to prevent and abate air pollution."  The test cells, by ensuring that vehicle and engine emissions are clean enough to pass federal emissions standards, are designed to prevent and abate air pollution.  Although the test cells were installed to ensure compliance with federal emissions regulations, they nonetheless accomplish the purpose of part 55—to prevent and abate air pollution.  The test cells meet the intent and purposes of part 55 of NREPA because the test cells function to prevent and abate noxious air pollutants.[19]

---

[18] *Covert Twp*, 407 Mich at 582.

[19] *Covert Twp* agreed with the STC's holding that the intent and purposes of the predecessor to part 55 "'are served by pollution control facilities constructed within the State of Michigan whether required by reason of federal or state regulation. . . .  It is the fact that pollution control is *provided* that is important and

(continued…)

19

Petitioners' test-cell facilities qualify for tax exemptions under part 59 because they meet the definition of "facility" in MCL 324.5901 and, under MCL 324.5903, are "designed and operated primarily for the control, capture, and removal of pollutants from the air," are "suitable" or "reasonably adequate" at abating air pollution, and "meet the intent and purposes of part 55."

The lead opinion argues that the test cells do not meet the requirements of MCL 324.5903 because they do not actually remove, control, and capture pollution caused by the operation of petitioners' businesses. *Ante* at 11-13. I disagree. The statute does not require that the exempt equipment itself physically remove air pollutants; rather, it merely requires that it be *intended and operated primarily for that purpose*. Moreover, the statute does not require that the pollution removed by the exempt equipment be that *created by the operation of petitioners' businesses*; rather, the statute only refers to air pollution generally, without specifying any particular source of pollution. As explained earlier, the test cells here were intended primarily for, and functioned as, integral parts of a pollution-control process designed to regulate and curb air pollution produced by petitioners' engines and vehicles. Therefore, the test cells were "designed and operated primarily for the control, capture, and removal of pollutants from the air."

---

(…continued)

not whether that pollution control is provided in response to state or federal regulation.'" *Id.* at 579 (emphasis in original).

The lead opinion also sua sponte injects the argument that in order for a facility to meet the intent and purposes of part 55, it must regulate a "source" of pollution as defined by MCL 324.5501(t). *Ante* at 13-14. The lead opinion attempts to extrapolate the intent and purposes of "the whole of part 55," *ante* at 13 n 23, by putting together bits and pieces of part 55. This method is flawed. MCL 324.5540 clearly and unambiguously states the purpose of part 55:

> It is the purpose of this part to provide additional and cumulative remedies to prevent and abate air pollution. This part does not abridge or alter rights of action or remedies now or hereafter existing. This part or anything done by virtue of this part shall not be construed as estopping persons from the exercise of their respective rights to suppress nuisances or to prevent or abate air pollution.

We give this language its plain meaning and enforce it as written. *Ayar v Foodland Distributors*, 472 Mich 713, 715; 698 NW2d 875 (2005). The title and declared purpose of part 55 refer to air-pollution control generally. The lead opinion wrongly argues that the intent and purposes of part 55 are not to prevent and abate air pollution generally, but instead to provide remedies in addition to private or citizen suits related to pollution control. Under the lead opinion's faulty interpretation of the intent of part 55, only facilities that provide "additional remedies" would be eligible for a tax exemption under MCL 324.5903. The lead opinion fails to explain how pollution-control facilities other than the test cells can provide "additional remedies" that the test cells cannot.

21

Moreover, although part 55 mainly deals with stationary sources, this fact is not dispositive because part 55 also refers to nonstationary sources used for transportation.[20] The lead opinion discusses part 55's definition of "source" in a vacuum, while ignoring the other defined terms in part 55. For example, part 55 also governs "process equipment," which it defines as "all equipment, devices, and auxiliary components, *including air pollution control equipment*, stacks, and other emission points, used in a process." MCL 324.5501(q) (emphasis added). Part 55 defines "air pollution control equipment" as "any method, process, or equipment that removes, reduces, or renders less noxious air contaminants discharged into the atmosphere." MCL 324.5501(c). Test cells arguably qualify as "air pollution control equipment" because they ensure that vehicles and engines do not exceed federal emissions standards, thus reducing air contaminants discharged into the atmosphere. The important point, however, is that the lead opinion identifies no language from part 55 or elsewhere stating that the "intent and purposes" of part 55 are to regulate pollution exclusively from "sources."

---

[20] See, e.g., MCL 324.5501(b) ("With respect to any mode of transportation, nothing in this part or in the rules promulgated under this part shall be inconsistent with the federal regulations, emission limits . . . ."); MCL 324.5513 ("Notwithstanding any other provision of this part or the rules promulgated under this part, car ferries having the capacity to carry more than 110 motor vehicles and coal-fueled trains used in connection with tourism or an historical museum or carrying works of art or items of historical interest are not subject to regulation under this part."); MCL 324.5512(1) ("The department shall promulgate rules for purposes of doing all of the following: . . . (c) Controlling any mode of transportation that is capable of causing or contributing to air pollution."

22

Even if the lead opinion were correct that part 55 exclusively governs "sources," this would not preclude the test cells from meeting the intent and purposes of part 55. The lead opinion neglects to quote the following part of the definition of "source" in part 55: "*A source includes all the processes and process equipment* under common control that are located within a contiguous area, or a smaller group of processes and process equipment as requested by the owner or operator of the source, if in accordance with the clean air act." MCL 324.5501(t) (emphasis added). As discussed earlier, because a test cell qualifies as "air pollution control equipment," it also qualifies as "process equipment," and accordingly as a "source" as defined by part 55.

The lead opinion's argument that part 55 is not intended to reduce motor-vehicle emissions because those emissions are covered by parts 61, 63, and 65 is misplaced. *Ante* at 15. Part 61 is not applicable because it merely prohibits marine vessels from blowing flues under certain conditions. Parts 63 and 65 include procedures for requiring certain motor vehicles in west and southeast Michigan that are more than one year old to be periodically inspected for emissions and obtain a certificate of compliance that would be necessary for registration renewal. Parts 63 and 65 do not include emissions standards for motor-vehicle engines during the design, manufacture, and sale stages, but only ensure that certain vehicles, which satisfy emissions standards when initially purchased, maintain a minimum level of emissions after one year on the road.

23

Further, parts 63 and 65 do not currently even regulate motor-vehicle emissions in west and southeast Michigan because those parts of the state have apparently attained the national ambient air quality standards for ozone. See MCL 324.6306(2); MCL 324.6507(2). In sum, parts 61, 63, and 65 in no way detract from the intent and purposes of part 55, which are to generally prevent and abate air pollution, including by reducing that air pollution from motor-vehicle engines by regulating their design and manufacture before sale.

The lead opinion also ignores the provision that a facility qualifies for a tax exemption only if it "meets the intent and purposes of part 55 *and rules promulgated under that part . . . .*" MCL 324.5903 (emphasis added). Reading the "intent and purposes" language in context with the "rules promulgated" language[21] makes it clear that one of the intents and purposes of part 55 is to reduce pollution from motor vehicles. Part 55 expressly provides that "[t]he department shall promulgate rules for the purpose of doing all of the following: . . . (c) Controlling *any mode of transportation* that is capable of causing or contributing to air pollution." MCL 324.5512(1)(c) (emphasis added). This provision supports the conclusion that the intent of part 55 is not confined to the reduction of pollution from stationary sources. Thus, the test cells both meet

---

[21] This Court must consider "both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'" *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999), quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

the intent and purposes of part 55 and comply with the rules promulgated under part 55 governing pollution created by motor vehicles.

Moreover, the lead opinion errs by stating that our interpretation renders part of MCL 324.5903 "nugatory or mere surplusage." *Ante* at 13 n 23. MCL 324.5903 requires that the "facility" be "designed and operated primarily for the control, capture, and removal of pollutants from the air, and [be] suitable, reasonably adequate, and meet[] the intent and purposes of part 55," which are "to prevent and abate air pollution," MCL 324.5540. The lead opinion argues that if "the 'intent and purposes' of part 55 are simply the reduction of air pollution, then [the second requirement of MCL 324.5903, that the facility meet this purpose,] adds nothing to the first requirement [of MCL 324.5903, that the facility control, capture, and remove pollutants from the air]." *Ante* at 13 n 23. I respectfully disagree. The second requirement indicates the *purpose* of the "facility," i.e., "to prevent and abate air pollution," while the first requirement describes the *means* by which this purpose is to be achieved, i.e., by "control[ing], captur[ing], and remov[ing] pollutants from the air." Thus, this interpretation does not render any part of this statute "nugatory or mere surplusage."

## B. *DETROIT DIESEL'S EQUINOX LINE FACILITY*

I concur with the lead opinion's holding that Detroit Diesel's Equinox Line facility does not qualify for tax exemptions under part 59 because the primary

25

purpose of the Equinox Line is to produce engines, not to control or dispose of air pollution. In order to qualify for the tax exemption, the Equinox Line must meet the definition of "facility" under MCL 324.5901. MCL 324.5901 defines "facility," in pertinent part, as follows:

> [M]achinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or disposing of air pollution that if released would render the air harmful or inimical to the public health or to property within this state. Facility includes an incinerator equipped with a pollution abatement device in effective operation. Facility does not include an air conditioner, dust collector, fan, or other similar facility for the benefit of personnel or of a business. *Facility also means the following*, if the installation was completed on or after July 23, 1965:
>
> * * *
>
> (c) A process change involving production equipment made to satisfy the requirements of part 55 and rules promulgated under that part. The maximum cost allowed shall be 25% of the cost of the new process unit but shall not exceed the cost of the conventional control equipment applied on the basis of the new process production rate on the preexisting process. [MCL 324.5901 (emphasis added).]

Thus, under MCL 324.5901, a "facility" may be either "machinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or disposing of air pollution that if released would render the air harmful or inimical to the public health or to property within this state" *or* "[a] process change involving production equipment made to satisfy the requirements of part 55 and rules promulgated under that part."

26

The Equinox Line does not satisfy the requirements of the tax exemption under MCL 324.5901 for a "facility" because the Equinox Line was not designed for the *primary purpose* of controlling or removing air pollutants. Unlike the test cells, which were installed for the primary and sole purpose of testing and controlling exhaust emissions, the Equinox Line was installed for the primary purpose of manufacturing engines. Although the Equinox Line assists in controlling and disposing of air pollution by manufacturing less-polluting engines that meet EPA standards, this purpose is secondary. Instead, the primary purpose of the line remains manufacturing engines for sale. Just because a manufacturing facility is altered or built to assure compliance with environmental laws does not mean that its primary purpose of manufacturing is transformed into a new primary purpose of controlling air pollution. The latter purpose remains secondary.[22] Therefore, because, unlike the test cells, the Equinox Line was not installed primarily to control or dispose of air pollution, I concur with the lead opinion's

---

[22] To further illustrate, we offer the following hypothetical situation: if a manufacturing plant builds a new office building for pollution-control engineers charged with controlling and disposing of air pollution released by the plant and its products, the office building would not qualify as a "facility" under MCL 324.5901. That is so because the primary purpose of the office building is to provide offices for employees, not to control or reduce pollution. The fact that the office building provides necessary accommodations for pollution-control engineers, and, therefore, indirectly or secondarily aims at controlling air pollution, does not transform its primary purpose.

27

holding that Detroit Diesel's Equinox Line is not a facility under MCL 324.5901.

As a result, the Equinox Line does not qualify for tax exemptions under part 59.[23]

Although the lead opinion does not address this argument, Detroit Diesel's

argument that the Equinox Line is a "facility" because it is "[a] process[24] change

involving production equipment made to satisfy the requirements of part 55 and

rules promulgated under that part" is not valid.[25] The stated purpose of part 55 is

to prevent and abate air pollution.[26] Detroit Diesel did not install the Equinox Line

specifically to meet the requirements of part 55, but rather installed the Equinox

Line to manufacture engines that comply with EPA requirements. That the

installation of the Equinox Line furthers the purpose of part 55 does not mean that

it was done to satisfy the *requirements* of part 55. As a result, the Equinox Line is

not a "facility" under MCL 324.5901 because it is not "[a] process change

---

[23] Detroit Diesel also is not entitled to a tax exemption because the Equinox Line does not satisfy MCL 324.5903, which mandates that a "facility is designed and operated primarily for the control, capture, and removal of pollutants from the air" in order to qualify for a tax exemption. The Equinox Line was designed for the primary purpose of manufacturing engines for sale, not for the purpose of abating pollution.

[24] Part 55 defines "process" as "an action, operation, or a series of actions or operations at a source that emits or has the potential to emit an air contaminant." MCL 324.5501(p). Part 55 defines "process equipment" as "all equipment, devices, and auxiliary components, including air pollution control equipment, stacks, and other emission points, used in a process." MCL 324.5501(q).

[25] MCL 324.5901(c).

[26] MCL 324.5540.

involving production equipment made to satisfy the requirements of part 55 and rules promulgated under that part."

Detroit Diesel's Equinox Line does not qualify for tax exemptions because the Equinox Line is neither "machinery, equipment, structures, or any part or accessories of machinery, equipment, or structures, installed or acquired for the primary purpose of controlling or disposing of air pollution that if released would render the air harmful or inimical to the public health or to property within this state" nor "[a] process change involving production equipment made to satisfy the requirements of part 55 and rules promulgated under that part." As a result, the Equinox Line is not a facility under MCL 324.5901 and does not qualify for a tax exemption.

## IV. DUE PROCESS

I do not find Detroit Diesel's due-process argument persuasive. Detroit Diesel argues that the STC's hearing process violated due process because the STC announced at the beginning of the hearing: "It is the position of the State Tax Commission after consultation with legal counsel that it has neither the authority nor the technical expertise to override a determination by the DEQ in regards to whether particular assets qualify for an air pollution control exemption." Detroit Diesel argues that the STC, by abdicating its role as a true decision maker, deprived Detroit Diesel of a meaningful hearing.

> Generally, due process in civil cases requires notice of the nature of the proceedings and an opportunity to be heard in a meaningful time and manner by an impartial decisionmaker.

29

Because the collection of a tax constitutes a deprivation of property, a state must provide sufficient procedural safeguards to satisfy due process requirements. But states are afforded great flexibility in satisfying the requirements of due process in the field of taxation. Due process is satisfied when a taxpayer has "a fair opportunity to challenge the accuracy and legal validity of their tax obligation and a clear and certain remedy for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one.[27]

Here, part 59 provides that an applicant for a tax exemption is entitled to a hearing:

Before issuing a certificate, the state tax commission *shall seek approval of the department* and give notice in writing by certified mail to the department of treasury and to the assessor of the taxing unit in which the facility is located or to be located, and shall afford to the applicant and the assessor an opportunity for a hearing.[28]

Under MCL 324.5902(1), a petitioner sends an application for a tax-exemption certificate to the STC. MCL 324.5902(2) requires the STC to both allow the applicant an opportunity for a hearing and forward the application to the DEQ for approval. If the hearing concludes before the DEQ makes a determination, the STC must then refer the matter to the DEQ for consideration of factual developments at the hearing and to seek approval of the tax certificate. If the hearing concludes after the DEQ makes a determination, as in the instant case,

---

[27] *By Lo Oil Co v Dep't of Treasury*, 267 Mich App 19, 29; 703 NW2d 822 (2005) (internal citations and quotations omitted).

[28] MCL 324.5902(2) (emphasis added).

the STC may grant or deny the certificate on the basis of the original DEQ determination and the developments at the hearing, or refer the matter again to the DEQ for consideration of any new information developed at the hearing. The DEQ, not the STC, has the authority and expertise to determine whether the facility is entitled to a tax exemption under part 59.

MCL 324.5903 provides, in pertinent part:

> If the department finds that the facility is designed and operated primarily for the control, capture, and removal of pollutants from the air, and is suitable, reasonably adequate, and meets the intent and purposes of part 55 and rules promulgated under that part, the department shall notify the state tax commission, which *shall issue a certificate*. [Emphasis added.]

MCL 324.5908 provides that although the STC may adopt rules considered necessary for administration of part 59 of NREPA, "[t]hese rules shall not abridge the authority of the department to determine whether or not air pollution control exists within the meaning of this part." Thus, although the STC is the agency that actually issues the tax-exemption certificate, it must defer to the DEQ's determination whether a petitioner is entitled to a tax exemption under part 59.

Further, even assuming that the STC can grant a tax-exemption certificate without the DEQ's approval, the hearing conducted by the STC in this case complied with due process. As required by MCL 324.5902(2), the STC forwarded Detroit Diesel's application for tax-exemption certificates to the DEQ for approval. After receiving the DEQ's determination that Detroit Diesel was not entitled to the tax exemptions, the STC afforded Detroit Diesel an opportunity for

31

a hearing. The hearing at the STC was not meaningless. The STC gave Detroit Diesel a full hearing in which it was allowed to present evidence and argue that the STC was not bound by the DEQ findings. Detroit Diesel identifies no evidence or legal argument that it was prevented from submitting. Although the STC stated at the outset of the hearing that it lacked the authority to override a DEQ determination regarding an air-pollution-control tax exemption, the STC did not conduct the hearing merely to rubber-stamp the DEQ's earlier decision. Rather, the STC conducted the hearing to gather additional information and forward this information to the DEQ for further consideration and another determination. Unfortunately for Detroit Diesel, the DEQ again decided that Detroit Diesel was not entitled to the tax exemptions. But because the DEQ considered the information developed at the hearing to determine whether to change its determination, the hearing was not meaningless. Thus, Detroit Diesel was afforded due process during the STC proceedings.

## V. CONCLUSION

In conclusion, I dissent from the lead opinion and would affirm the Court of Appeals. I would hold that petitioners' test-cell facilities qualify for tax exemptions under part 59 because they meet the definition of "facility" in MCL 324.5901 and, under MCL 324.5903, are "designed and operated primarily for the control, capture, and removal of pollutants from the air," are "suitable" or "reasonably adequate" at abating air pollution, and "meet the intent and purposes

32

of part 55."  I concur with the lead opinion's holding that Detroit Diesel's Equinox Line does not qualify for tax exemptions under part 59 because the Equinox Line is not a "facility" under MCL 324.5901.  Lastly, I would hold that Detroit Diesel was not deprived of due process during the STC proceedings.

Elizabeth A. Weaver
Maura D. Corrigan
Stephen J. Markman