**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED MAY 5, 2004**

CATALINA MARKETING SALES CORPORATION,

    Petitioner-Appellant,

v                                  No. 121673

DEPARTMENT OF TREASURY,

    Respondent-Appellee.

_____

CATALINA MARKETING CORPORATION,

    Petitioner-Appellant,

v                                  No. 121674

DEPARTMENT OF TREASURY,

    Respondent-Appellee.

_____

BEFORE THE ENTIRE BENCH

WEAVER, J.

The issue in this case is whether the Michigan Tax Tribunal and the Court of Appeals erred in holding that

petitioners' Checkout Coupon™ program, which involves both the transfer of tangible personal property and the provision of services, constitutes a sale at retail that is subject to sales tax under MCL 205.52. Respondent, the Department of Treasury, alleges that petitioners sold coupons to its manufacturer-clients and that these were sales at retail on which petitioners owe sales tax. Petitioners contend that they were selling services, not goods, and that the delivery of the manufacturer-clients' coupons and advertising messages was only one part of the sophisticated targeted marketing distribution services they provide to their manufacturer-clients.

We adopt the "incidental to service" test for categorizing a business relationship that involves both the provision of services and the transfer of tangible personal property as either a service or a tangible property transaction and we remand the case to the Michigan Tax Tribunal (MTT) for application of the "incidental to service" test, consistent with this opinion.

I

This case concerns a taxation dispute between petitioners, Catalina Marketing Corporation and Catalina Marketing Sales Corporation (Catalina), and the Michigan Department of Treasury. Since its inception in 1983,

2

Catalina has provided its clients, consumer products manufacturers, with alternative mass marketing strategies.

Catalina developed the Checkout Coupon™ program, under which Catalina contracts with its manufacturer-clients to deliver a coupon or advertising message to certain specified shoppers as they check out at a grocery store on the basis of what they buy at that time. For example, if Catalina's manufacturer-client is Campbell's Soup, Campbell can contract to have a coupon reading "$1 off your next purchase of Campbell's Soup" printed out at the supermarket checkout counter whenever someone purchases a can of its soup to encourage repeat business. Or Campbell's Soup can specify that the $1-off coupon for Campbell's Soup be printed out whenever a competitor's brand of soup is purchased or whenever someone buys a box of crackers. If the shopper does not buy any of the triggering items, no coupon or advertising message is printed. Catalina's coupons and advertising messages are printed on thermal paper; they do not use sharp graphics or bold colors.

The Checkout Coupon™ program takes advantage of the Universal Product Codes, or bar codes, that appear on the packaging of most consumer goods. Retailers scan the bar code at the checkout register to tabulate the sale, generate a receipt, and monitor their own inventories. Catalina has developed hardware and software that collect

3

data on the products as they are being scanned at the checkout register. The collected data are transferred to one of Catalina's centralized databases in Florida or California. Catalina has also installed thermal printers near the checkout scanners, which printers it uses to produce either coupons or advertising messages. Catalina owns, installs, and maintains all its hardware and software, and maintains the stocks of paper utilized by the printers.

Catalina provides its manufacturer-clients with exclusive access to a certain product category—such as soup, diapers, pasta sauce, etc.—in four-week cycles. Catalina and the manufacturer-clients work together to identify the desired product category.

A software program installed in Catalina's centralized databases analyzes the product information it receives from the supermarket checkout scanners and determines whether an item fits into any desired product categories. If the item is not part of a desired product category, no response is generated. If the item falls within a desired product category, the centralized database will generate one of three responses. The manufacturer-client chooses what the response will be.

The first possible response is the creation of a manufacturer's redeemable coupon. The centralized database

4

will send data by way of the Catalina network, instructing a printer near the checkout scanner to produce a manufacturer's redeemable coupon. Catalina does not influence the text or images that appear on the coupon; these details are left to the sole discretion of the client-manufacturer. When the supermarket sale is complete, the cashier presents the coupon to the consumer along with the supermarket's receipt. The consumer then has the option of retaining the coupon and redeeming it on the next visit to the supermarket retailer.

The second possible response in the Checkout Coupon™ program is the production of a general announcement advertising a manufacturer-client's product. The process behind producing a general announcement is identical to that of the coupon: an item that fits into a desired product category triggers a response from one of Catalina's centralized databases. Rather than generating a coupon at the point of sale, however, Catalina's centralized database instead sends instructions to the printer to produce a general advertising announcement, such as "Campbell's Soup is M'm-M'm Good." The manufacturer-client has full authority over the text and images that appear on the general advertising announcement.

The third and final potential response in the Checkout Coupon™ program is the generation of no response at all. A

5

manufacturer-client can contract for a four-week period in a certain product category, but choose to have no coupons or messages printed. Although the manufacturer-client is not publishing any coupons or messages of its own, it is preventing a competitor from using Catalina's services for that four-week period.

The manufacturer-clients pay Catalina the higher of a base program fee or a per coupon rate identified in the contract. Catalina has developed cost per coupon pricing according to a three-tier scale. The first and most expensive tier is for coupons dispensed when a competitor's product of the same desired product category is scanned. Catalina justifies this higher cost by asserting that coupons dispensed under these circumstances require more research as well as the development of more complex software. The second tier is for cross-category coupons, or coupons for items produced by the manufacturer-client, but are for a product different from the actual item scanned. Coupons produced and distributed under these circumstances require less research and less complex software. The third and least expensive tier is for own user coupons, or coupons for the exact item that has been scanned. These coupons require the least amount of research and software development.

6

The Department of Treasury conducted a sales and use tax audit of Catalina for the period from January 1, 1991, through June 30, 1993. Following the audit, Catalina submitted a check for $38,002 (plus interest) to the department intended to constitute full payment of its Michigan use tax liability for the audit period. The department contends that Catalina is liable for a total of $383,856.06 in sales tax and interest. Catalina filed petitions with the Michigan Tax Tribunal contesting the sales tax assessment. Both Catalina and the department moved for summary disposition pursuant to MCR 2.116(C)(10). The Tax Tribunal denied Catalina's motion and granted the department's motion, holding Catalina liable for the sales tax. The Court of Appeals affirmed in an unpublished opinion.[1] This Court granted leave to appeal, limiting the issues to one question: "whether petitioners' 'coupon checkout program' constitutes 'sales at retail' under MCL 205.52."[2]

## II

In the absence of fraud, review of a Tax Tribunal decision is limited to determining whether the tribunal erred in applying the law or adopted a wrong principle.

---

[1] Unpublished opinion per curiam, issued March 5, 2002 (Docket Nos. 221811, 221890).

[2] 468 Mich 869 (2003).

The Tax Tribunal's factual findings are conclusive if supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28. *Michigan Bell Telephone Co v Dep't of Treasury,* 445 Mich 470, 476; 518 NW2d 808 (1994).

## III

The parties have conceded that petitioners owe either the use tax already paid by Catalina, or the sales tax assessed by the department.[3] Thus, the question before us is whether the Tax Tribunal and the Court of Appeals correctly held that Catalina owed sales tax on its transactions with its merchant-clients.

As a general rule, sales tax applies only to sales of tangible personal property, not sales of services.[4] When a single transaction, as here, involves both the provision of services and the transfer of tangible personal property, it

---

[3] "A sales-use tax scheme is designed to make all tangible personal property, whether acquired in, or out of, the state subject to a uniform tax burden. Sales and use taxes are mutually exclusive but complementary, and are designed to exact an equal tax based on a percentage of the purchase price of the property in question." 85 CJS 2d, Taxation, § 1990, p 950.

[4] Although there are specific exceptions, such as sales of transmission and distribution services for electricity, MCL 205.51(d), none of those exceptions applies in this case. See also MCL 205.51(h), enacted after the present case arose, which provides that a "commercial advertising element" is not a sale at retail. 1995 PA 209, § 1.

8

must be categorized as either a service or a tangible property transaction.

Catalina contends that its business is a service—the provision of advertising research and expertise to manufacturers, that the transfer of the slips of paper with coupons or advertising messages to the manufacturers is incidental to this service, and that its transactions are therefore not subject to sales tax. The department contends that the direct object of the contract between the petitioners and the manufacturers is the transfer of the coupons and, therefore, the transactions are subject to sales tax.

In determining whether Catalina's transaction with a manufacturer was a retail sale or a sale of services, the Tax Tribunal applied a narrow version of the "real object test," as set forth by the Department of Treasury in Revenue Administrative Bulletin 1995-1 (RAB 95-1):[5]

---

[5] The real object test originated with *Shelby Graphics, Inc v Dep't of Treasury,* 5 MTT 63; 1986 Mich Tax LEXIS 59 (1986), decided nine years before the issuance of RAB 95-1. There, the petitioner furnished advertising products, such as signs and banners, to a chain of grocery stores. The products were designed by the petitioner's graphic artist, and a representative of the grocery store testified that it relied heavily on the creative skills of the artist. The state assessed sales tax on the sale of the signs and banners. Shelby Graphics argued that its customers were paying for creative design services, not the actual advertisements. The Michigan Tax Tribunal adopted the real

9

Accordingly, *the linchpin issue* requiring review and resolution is whether, *from the perspective of the manufacturer-clients*, the "real object" sought by them from the business activities of CMC and CMSC during the audit period involved the purchase, for distribution to retail consumers, of tangible coupons pursuant to contracts between Petitioners and the manufacturers, or whether the real object sought by the manufacturers consisted of the receipt of nontaxable computer and informational services from Petitioners. [MTT order, entered August 9, 1999, p 15 (emphasis in original).]

Applying that test, the Tax Tribunal held that the direct object of the transaction was the coupon and, therefore, the entire transaction was subject to sales tax.

In this "mixed" service/sales transaction, the objective evidence shows the "customized" (SOF, Ex. I) Checkout Coupons and advertising messages, which are printed at supermarket checkout lanes for distribution to *targeted* retail consumers, to be the "real object" of the manufacturers' contracts with Petitioners. It is that end product, the tangible personal property, which promotes a manufacturer's product(s) and which attempts, through discount offers and advertising messages, to convince consumers to purchase its product(s) in the future. [MTT order, entered August 9, 1999, p 30 (emphasis in original).]

object test and held that the sale of the advertising products constituted a sale at retail.

We note, however, that the sales tax act was subsequently amended to remove sales tax liability in circumstances similar to *Shelby Graphics.* 1995 PA 209, § 1 added MCL 205.51(h), which specifically excludes custom developed commercial advertising from the definition of "sale at retail."

As noted in n 4, the statutory amendment does not affect the outcome in this case. However, the legislative reaction calls into question the continued vitality of the *Shelby Graphics* analysis, upon which RAB 95-1 is based.

RAB 95-1 was not adopted under the Administrative Procedures Act, MCL 24.201 *et seq.*, and, therefore, does not have the force of law. *Danse Corp v Madison Hts,* 466 Mich 175, 181; 644 NW2d 721 (2002). RAB 95-1 merely states the department's interpretation of the statutes. In its brief, the department concedes that "it may not, through the issuance of an [RAB], create law or adopt rules conflicting with applicable statutes and binding court decisions."

During the years at issue, the General Sales Tax Act, MCL 205.51 *et seq.*, provided that

> there shall be collected from all persons engaged in the business of making sales at retail, as defined in section 1, an annual tax for the privilege of engaging in that business equal to 4% of the gross proceeds of the business. . . . [MCL 205.52(1).][6]

Sale at retail is defined in MCL 205.51(1)(b) as

> a transaction by which the ownership of tangible personal property is transferred for consideration, if the transfer is made in the ordinary course of the transferor's business and is made to the transferee for consumption or use, or for any purpose other than for resale . . . .

In 1996, the Court of Appeals issued a published opinion holding that when tangible goods were provided as an incidental part of a service, the goods were not subject

---

[6] The sales tax is now set at six percent, effective May 1, 1994.

11

to sales tax. *Univ of Mich Bd of Regents v Dep't of Treasury,* 217 Mich App 665; 553 NW2d 349 (1996). In *Bd of Regents*, the question was whether sales tax should be assessed against (1) photocopies costing five cents each made by students or others at photocopier machines placed at the university's libraries, student dormitories, and student union and (2) replacement diplomas ordered by graduates, costing five dollars each. The Court of Appeals first said:

> Fundamentally, the sales tax is a tax upon sellers for the privilege of engaging in the business of making retail sales of tangible personal property. "Business" is defined in the sales tax act as "an activity engaged in by a person or caused to be engaged in by that person with the object of gain, benefit, or advantage, either direct or indirect." MCL 205.51(1)(j). The university was not in the business of selling photocopies as a retail enterprise with a profit-making objective; the five-cent charge closely approximated the actual cost of one photocopy. Rather, the university provided an academic library, and the convenience of and charge for photocopies were an incidental part of library operations. [*Bd of Regents,* at 669 (citations omitted).]

The Court concluded that the photocopies were not subject to sales tax because "the photocopies in this case were not sold at retail to generate a profit. Rather, students' use of the photocopier machines was incidental to the library's circulation services and the university's educational mission." *Id.* at 670.

12

In examining the sale of the replacement diplomas for five dollars, *Bd of Regents* concluded that the university was offering a customized service to which the tangible paper was merely incidental. The Court explained that "the purchaser of a replacement diploma was paying for the services of the university's office of the registrar in reviewing its records and then producing a document containing highly personalized information, including the name of the graduate, the degree obtained, and the date of graduation." *Id.* at 670.

In this case the Tax Tribunal and the Court of Appeals erred in following RAB 95-1 rather than the "incidental to service" test set forth in *Bd of Regents*. The Michigan Tax Tribunal, as a tribunal inferior to the Court of Appeals, did not have the authority to reject and replace the statutory interpretation set forth by the Court of Appeals in a binding, precedential opinion. See MCR 7.215(C)(2) ("A published opinion of the Court of Appeals has precedential effect under the rule of stare decisis.") and *Michigan Bell, supra* at 476, citing Const 1963, art 6, §28 (the appellate courts may reverse the decision of the Tax Tribunal if it misapplied the law or adopted a wrong legal principle). The Court of Appeals panel here also erred in applying the department's narrow version of the real object test instead of following *Bd of Regents.* A Court of

13

Appeals opinion published after November 1, 1990, is binding precedent not only on the lower courts, but on subsequent panels of the Court of Appeals. MCR 7.215(C)(2), (I)(1).

This Court, of course, is not bound by Court of Appeals decisions. Nor are we bound by the department's use of a narrow version of the real object test. Although this Court affords deference to the construction of statutory provisions by any particular department of the government and used for a long period, the department's interpretation "is not binding on this Court and 'cannot be used to overcome the statute's plain meaning . . . .'" *Ludington Service Corp v Ins Comm'r,* 444 Mich 481, 505; 511 NW2d 661 (1994) (citation omitted).

We reject the department's narrow reading of the real object test. Under RAB 95-1 the question is whether, from the perspective of the client, the real object sought by the client was the purchase of the tangible good or the receipt of the services. The weakness of this test is that it is not consistent with the statutory definition of "sale at retail." The real object test focuses exclusively on the perspective of the purchaser. However, the purchaser's point of view is not given special consideration under the language of the statute. Instead, the statute's perspective is more broadly focused and requires a fuller

14

analysis that weighs not only the perspectives of the parties to the sale, but also the nature of the product and service. This latter approach is subsumed within the "incidental to service" test articulated by the Court of Appeals in *Bd of Regents, supra.*

Accordingly, we adopt the "incidental to service" test for categorizing a business relationship that involves both the provision of services and the transfer of tangible personal property as either a service or a tangible property transaction. Under this test, "sales tax will not apply to transactions where the rendering of a service is the object of the transaction, even though tangible personal property is exchanged incidentally." 85 CJS 2d, Taxation, § 2018, p 976. The "incidental to service" test looks objectively at the entire transaction to determine whether the transaction is principally a transfer of tangible personal property or a provision of a service. The sales tax is a tax on sellers for the privilege of engaging in the business of retail sales. If the consideration paid in a transaction is not paid for the transfer of the tangible property, but for the service provided, and the transfer of the tangible property is only

incidental to the service provided, the transaction is not a sale at retail under MCL 205.51(b).[7]

We agree with the statement in Am Jur 2d that the court must objectively examine the totality of the transaction in determining whether it is subject to sales tax:

> When tangible goods or items are provided in conjunction with services, courts examine the totality of the transaction to determine its taxability. The essence of the transaction test specifically applies to those sales tax cases in which it is initially unclear whether the transaction mixes sales and services. For purposes of determining whether a transaction falls within a sales tax statute, the court considers whether the tangible personal property serves exclusively as the medium of transmission for an intangible product or service; if the

---

[7] Additionally, although not outcome determinative in this case, as the language of the statute is our primary consideration, we note that the "incidental to service" test we adopt today is consistent with test utilized to differentiate goods from services under the Uniform Commercial Code. The UCC, found at MCL 440.1101 *et seq.*, applies only to transactions in goods, not services. MCL 440.2102. In contracts involving both goods and services, it must be determined whether the contracts are governed by the UCC. In *Neibarger v Universal Cooperatives, Inc*, 439 Mich 512, 534; 486 NW2d 612 (1992), this Court adopted the following test to determine whether mixed contracts are governed by the code:

> The test for inclusion or exclusion [in the UCC] is not whether [the contracts] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved . . . or is a transaction of sale, with labor incidentally involved . . . ." [Quoting *Bonebrake v Cox,* 499 F2d 951, 960 (CA 8, 1974).]

16

> intangible component is the true object of the sale, the intangible object does not assume the taxable character of a tangible medium. Where the item is the substance of the transaction, and the service or skill provided is merely incidental, the transaction is one for tangible personal property, to which sales tax may be applied. The focus belongs on the transaction, not the character of the participants. [68 Am Jur 2d, Sales and Use Taxes, § 62 pp 51-52.]

In determining whether the transfer of tangible property was incidental to the rendering of personal or professional services, a court should examine what the buyer sought as the object of the transaction, what the seller or service provider is in the business of doing, whether the goods were provided as a retail enterprise with a profit-making motive, whether the tangible goods were available for sale without the service, the extent to which intangible services have contributed to the value of the physical item that is transferred, and any other factors relevant to the particular transaction.

We vacate the Court of Appeals opinion that applied the wrong test and remand to the Michigan Tax Tribunal for application of the incidental to service test, in recognition of that quasi-judicial agency's expertise in questions concerning the factual underpinnings of taxes. *Romulus City Treasurer v Wayne Co Drain Comm'r*, 413 Mich 728, 737; 322 NW2d 152 (1982).

## CONCLUSION

The Court of Appeals decision is vacated and we remand this case to the Michigan Tax Tribunal, with instructions to apply the incidental to services test that we have adopted today. The Michigan Tax Tribunal's decision must be filed within ninety days of the date that this opinion is issued. The parties are ordered to submit briefs within thirty-five days after the decision of the Michigan Tax Tribunal. At that time the parties may request that the Court grant reargument. We retain jurisdiction.

Elizabeth A. Weaver
Maura D. Corrigan
Michael F. Cavanagh
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

18