MIDWEST BUS CORPORATION v DEPARTMENT OF TREASURY

Docket No. 288686. Submitted March 4, 2010, at Lansing. Decided March 16, 2010. Approved for publication May 4, 2010, at 9:00 a.m.

Midwest Bus Corporation, formerly known as Midwest Bus Rebuilders Corporation, brought an action in the Court of Claims against the Department of Treasury and the state treasurer, seeking the refund of single business taxes paid for certain tax years. Plaintiff claimed that for purposes of its single business tax base its sales of bus parts that were installed on buses when the plaintiff rehabilitated or remanufactured the buses should have been allocated to the states to which the buses were delivered after the rehabilitation work. Defendants claimed that the sales were incident to the rehabilitation work and should be allocated to Michigan, where the work was performed. The Court of Claims, James R. Giddings, J., granted summary disposition for defendants, agreeing with defendants that the predominate purpose of the bus rehabilitation contracts at issue was the provision of the rehabilitation service and that the service of actually installing the bus parts was not merely incident to the sale of the parts. Plaintiff appealed.

The Court of Appeals *held*:

1. The Single Business Tax Act, MCL 208.1 *et seq.*, repealed effective December 31, 2007, distinguishes between two types of sales for purposes of computing a taxpayer's tax base. The first type, sales of tangible personal property, are considered "in this state" if the property is shipped or delivered to any purchaser within this state. The second type, sales other than sales of tangible personal property, are considered "in this state" if either the business activity is performed in Michigan or, if performed in Michigan and elsewhere, based on costs of performance, the greater proportion of the business activity is performed in Michigan. The transactions at issue in this case are mixed transactions that involve sales of tangible personal property and sales other than sales of tangible personal property.

2. A six-part incidental-to-service test is applied to determine whether a transaction should be considered a sale of tangible personal property or a sale of a service, i.e., a sale other than a sale of tangible personal property, when a business relationship in-

volves both the provision of services and the transfer of tangible personal property. The test looks objectively at the entire transaction to determine whether it was principally a transfer of tangible personal property or a provision of a service. A court, in determining whether the transfer of tangible personal property was incidental to the rendering of personal or professional services, should examine (1) what the buyer sought as the object of the transaction, (2) what the seller or service provider was in the business of doing, (3) whether the goods were provided as a retail enterprise with a profit-making motive, (4) whether the tangible goods were available for sale without the service, (5) the extent to which intangible services have contributed to the physical item that was transferred, and (6) any other factors relevant to the particular transaction. Consideration of these factors in this case indicates that the Court of Claims correctly concluded that the remanufacturing contract primarily considered by the Court of Claims, as well as other remanufacturing contracts like it, are predominately for the provision of a service—a rehabilitation service. These sales are, for purposes of the sales factor used to determine the tax base, sales other than sales of tangible personal property and, because the services were provided in Michigan, the sales were in this state for purposes of MCL 208.53.

3. The sale of the bus parts was incidental to the service of actually performing the rehabilitation of the buses, and that service was provided in Michigan.

4. The Court of Claims did not abuse its discretion when it determined that plaintiff was not entitled to an award of sanctions under MCR 2.313(C) for defendants' failure to admit, pursuant to plaintiff's request for an admission under MCR 2.312(A), with regard to a matter that the parties voluntarily settled before the hearing on the parties' cross-motions for summary disposition.

Affirmed.

TAXATION — SINGLE BUSINESS TAX ACT — SALES — SERVICES — SALES INCIDENTAL TO SERVICES.

An incidental-to-service test may be applied to determine, for purposes of establishing a taxpayer's tax base under the Single Business Tax Act, whether a business transaction that involved both the transfer of tangible personal property and the provision of a service involved a transfer of tangible personal property that was incidental to the rendering of personal services; the test examines what the buyer sought as the object of the transaction, what the seller or service provider was in the business of doing, whether the goods were provided as a retail enterprise with a

profit-making motive, whether the goods were available for sale without the service, the extent to which intangible services have contributed to the physical item that was transferred, and any other relevant factors (MCL 208.1 *et seq.*, repealed effective December 31, 2007).

*Timothy J. Rudolph* for plaintiff.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Heidi L. Johnson-Mehney*, Assistant Attorney General, for defendants.

Before: FITZGERALD, P.J., and CAVANAGH and DAVIS, JJ.

CAVANAGH, J. Plaintiff appeals as of right a Court of Claims order granting defendants' motion for summary disposition in this tax dispute involving the Single Business Tax Act (SBTA), MCL 208.1 *et seq.*, repealed effective December 31, 2007. We affirm.

Plaintiff filed its declaratory judgment action following an audit covering single business tax years 1999 through 2004, and the receipt of tax due bills. Plaintiff averred that it was in the business of selling bus parts and remanufacturing buses. Plaintiff alleged that its remanufacturing contracts with various transit authorities involved primarily the sale of tangible personal property—bus parts, regardless of the fact that charges for plaintiff's installation of those parts were also included in the contracts. Accordingly, revenue from the sales at issue, which gave rise to the disputed tax due bills, should have been allocated to the destinations where the parts were shipped, as sales of tangible personal property under MCL 208.52, and not allocated to Michigan, under MCL 208.53, where the installation services were performed. Thus, plaintiff alleged, it was entitled to a refund of the overpayment of taxes.

Subsequently, cross-motions for summary disposition were filed and the parties agreed that the matter was controlled by the holding in *Catalina Mktg Sales Corp v Dep't of Treasury*, 470 Mich 13; 678 NW2d 619 (2004). Plaintiff's legal position remained the same. Defendants, however, argued that plaintiff's business of remanufacturing buses did not merely involve the sale of bus parts. Rather, plaintiff "remanufactured" buses, which meant that the service of actually installing the bus parts was not merely incidental to the sale of the parts—the rehabilitation service was the predominant purpose of the business contracts. Accordingly, revenue from the disputed sales is properly allocated to Michigan, under MCL 208.53, where the services were performed and plaintiff was not entitled to any refund or other relief. After consideration of the "incidental to service" six-part test set forth in *Catalina Mktg Sales Corp*, the Court of Claims agreed with defendants and granted their motion for summary disposition. This appeal followed.

First, plaintiff argues that the revenue it received from remanufacturing contracts like the one it had with the Massachusetts Bay Transportation Authority (MBTA) is predominantly for the sale of tangible personal property and should be allocated, under MCL 208.52, to destinations outside Michigan. We disagree. This Court reviews de novo a decision by the Court of Claims on a motion for summary disposition and issues requiring statutory interpretation. *Herald Wholesale, Inc v Dep't of Treasury*, 262 Mich App 688, 693; 687 NW2d 172 (2004).

The single business tax (SBT) was explained in *Trinova Corp v Dep't of Treasury*, 433 Mich 141; 445 NW2d 428 (1989), as follows:

> The single business tax is a form of value added tax, although it is not a pure value added tax. "Value added is

defined as the increase in the value of goods and services brought about by whatever a business does to them between the time of purchase and the time of sale." In short, a value added tax is a tax upon business activity. The act employs a value added measure of business activity, but its intended effect is to impose a tax upon the privilege of conducting business activity within Michigan. It is not a tax upon income. [*Id.* at 149 (citations omitted).]

The "value added" concept has been described as "a means of consistently measuring the size of business firms and other economic enterprises comprising the total economy . . . ." Haughey, *The economic logic of the single business tax*, 22 Wayne L R 1017 (1976). "[T]he measure of the tax is the use of labor and capital." Kasischke, *Computation of the Michigan single business tax: Theory and mechanics*, 22 Wayne L R 1069, 1070 (1976).

The computation of the SBT involves several steps, but begins with calculation of the taxpayer's tax base. "The tax base computation is designed to calculate the contribution each business makes to the total economy; in economic terms, this contribution is the economic size of the business." *Id.* "Each business will pay a tax proportionate to its economic size." *Id.* If the taxpayer's business activities are confined to Michigan, the entire tax base is allocated to Michigan and subject to taxation under the SBTA. See MCL 208.40. If the taxpayer's business activities are taxable both in Michigan and another state, only a certain part of its tax base is allocated to Michigan because a state may not tax value earned outside of its borders. See MCL 208.41; *Trinova Corp*, 433 Mich at 151 (citation omitted).

The SBTA provides a formula for apportioning a tax base between two or more taxing states and the formula takes into consideration three factors: property, payroll, and sales. *Id.* at 151-152; see, also, MCL 208.45a. At

issue in this case is the sales factor. Under MCL 208.51(1), the sales factor is a fraction that has as its numerator the taxpayer's total sales in this state, and as its denominator "the total sales of the taxpayer everywhere during the tax year." The SBTA distinguishes between two types of sales: sales of tangible personal property and sales "other than sales of tangible personal property . . . ." MCL 208.52 and MCL 208.53. For purposes of the sales factor, under MCL 208.52(b), sales of tangible personal property are considered "in this state," if "the property is shipped or delivered to any purchaser within this state . . . ." And, under MCL 208.53, sales, "other than sales of tangible personal property," are considered "in this state" if either the business activity is performed in Michigan or if performed in Michigan and elsewhere, "based on costs of performance, the greater proportion of the business activity is performed in this state . . . ." Sales "in this state" are placed in the numerator of the sales factor, while sales not considered "in this state" are placed in the denominator.

On appeal the parties agree that the transactions at issue in this case are "mixed transactions" in that they involve elements of both sales of tangible personal property and sales other than sales of tangible personal property. That is, bus parts were sold, but so was the service of installing the bus parts. However, plaintiff claims that the sale of bus parts was the primary purpose of the transactions and that the bus parts were "sold," for purposes of the sales factor, when each completely rehabilitated bus was delivered back to its out-of-state owner. Thus, the "sale" of tangible personal property was not "in this state" and belongs in the denominator of the sales factor. Defendants disagree and claim that plaintiff's complete rehabilitation of each bus was the primary purpose of the transaction

and, because this business activity was performed in Michigan, the "sale" was "in this state" and belongs in the numerator of the sales factor. The SBTA is silent with regard to these types of transactions. But the parties agree that the six-part incidental-to-service test set forth in *Catalina Mktg Sales Corp* is applicable to determine whether a transaction should be considered a sale of tangible personal property or a sale of a service, i.e., a sale other than a sale of tangible personal property.

In *Catalina Mktg Sales Corp*, the issue was whether, under MCL 205.52 of the General Sales Tax Act, a retail sales tax should be imposed in a transaction that involved both the provision of services and the transfer of tangible personal property because sales tax does not apply to sales of services. The *Catalina* Court, citing *Univ of Mich Bd of Regents v Dep't of Treasury*, 217 Mich App 665; 553 NW2d 349 (1996), adopted "the 'incidental to service' test for categorizing a business relationship that involves both the provision of services and the transfer of tangible personal property as either a service or a tangible property transaction." *Catalina Mktg Sales Corp*, 470 Mich at 24. The *Catalina* Court explained that the test "looks objectively at the entire transaction to determine whether the transaction is principally a transfer of tangible personal property or a provision of a service." *Id.* at 24-25. And "[i]n determining whether the transfer of tangible property was incidental to the rendering of personal or professional services, a court should examine what the buyer sought as the object of the transaction, what the seller or service provider is in the business of doing, whether the goods were provided as a retail enterprise with a profit-making motive, whether the tangible goods were available for sale without the service, the extent to which intangible services have contributed to the value

of the physical item that is transferred, and any other factors relevant to the particular transaction." *Id.* at 26. In our case, the parties agree that the *Catalina* factors are applicable, but their analysis of each factor significantly differs. We first turn to plaintiff's argument.

Plaintiff argues that its remanufacturing business involves principally a transfer of tangible personal property. Plaintiff claims that its contract with the MBTA proves its contention. The contract required plaintiff to replace 427 parts on each of the MBTA's 125 transit buses, and also set forth a list of 164 parts that plaintiff should replace on those same buses if needed. Thus, plaintiff argues, "[c]learly, these 552 items of tangible personal property are the focus of the contract and any labor involved in their installation is incidental to the tangible personal property." And, "the cost of tangible personal property in performing the contractual obligations was 5.086 times the cost of labor." This evidence "all supports a ruling that tangible personal property is the 'substance of the transaction' . . . . Therefore, the revenue should be sourced out of Michigan."

With regard to the specific factors, plaintiff appears to argue that (1) what the MBTA sought as the object of the transaction was brand new bus parts, (2) plaintiff is in the bus parts business, (3) plaintiff's "profits are dependent upon bus parts sales," (4) "while the [bus] parts are available without the services, capital grant funding is available for a rehabilitation project of a fleet of buses and is not available if the transit authority simply buys the parts and replaces them," (5) it has not been established that any services, other than the installation of parts, increase the value of the buses beyond the value of the replaced parts, themselves, and (6) "Buy America requirements," as well as the fact that

bus remanufacturing is a capital project eligible for capital grants, support the conclusion that such transactions should be treated as the transfer of tangible property—bus parts.

To the contrary, defendants argue, the MBTA contract "conclusively establishes that the transfer of parts is incidental to the provision of [plaintiff's] rehabilitation service." The title of the contract itself—"Technical Specification for Nova Bus Rehabilitation"—proves that contention. The object of the transaction, as far as the MBTA was concerned, was for its buses to be "rehabilitated." The contract defines "rehabilitation" to include (1) "the restoration of items to new, as new, or reconditioned functionally, as the case may be, to the original manufacturer's recommendations," (2) "the complete disassembly of an assembly or sub-assembly into its component parts, or, to the degree defined in the individual sections of the Specifications," (3) "[t]he cleaning, inspection and qualification for repair or replacement of the component parts," and (4) "[t]he reassembly of the component parts into complete assemblies." Thus, contrary to plaintiff's claims, the contract required that plaintiff perform extensive servicing of the buses.

With regard to the six specific factors, defendants appear to argue that (1) what the MBTA sought as the object of the transaction was the service of having its buses rehabilitated, i.e., overhauled, (2) plaintiff is in the business of remanufacturing or rehabilitating buses, as well as supplying bus parts because parts can be ordered and sent to a customer instead of having plaintiff perform the installation service, (3) defendants contend that this factor is not applicable because it "is clearly intended to help determine whether a retail sale that is taxable under the General Sales Tax Act took place," (4) bus parts are

available for sale by plaintiff without the service but that is not "remanufacturing," (5) the rehabilitation service necessarily contributes significantly to the value of the bus parts because the MBTA contracted to have its buses rehabilitated and thus, absent their installation, the parts would have been worthless to the MBTA, and (6) no other factors were relevant to the particular transaction.

After objectively considering the entire transaction, *Catalina Mktg Sales Corp*, 470 Mich at 24-25, we agree with the Court of Claims and conclude that the remanufacturing contract at issue, as well as other remanufacturing contracts like it, are predominantly for the provision of a service—a rehabilitation service. Thus, for purposes of the sales factor, these are sales "other than sales of tangible personal property" and, because the services were provided in Michigan, the sales were "in this state" under MCL 208.53. This conclusion was reached in light of the following considerations.

First, we reviewed the MBTA remanufacturing contract. The contract clearly states that it is for a "midlife overhaul, (i.e., Rehabilitation)" of transit buses. In that regard, the contract provides:

> This overhaul project shall include repairs or replacement of the components utilized in the following systems and/or assemblies: wheelchair lift, underbody structure, front and rear axle assemblies, interior and exterior body, wiring and piping, steering, suspension, signage, brakes, fuel system, kneeling system, and air system. The project also includes painting the bus and making any other miscellaneous repairs needed to correct broken or worn components.

The contract defines several terms, but three are especially relevant in this case:

**Rehabilitation:**

a. Shall mean the restoration of items to new, as new, or reconditioned functionally, as the case may be, to the original manufacturer's recommendations.

b. Shall mean the complete disassembly of an assembly or sub-assembly into its component parts, or, to the degree defined in the individual sections of the Specifications.

c. The cleaning, inspection and qualification for repair or replacement of the component parts.

d. The reassembly of the component parts into complete assemblies

\*   \*   \*

**Remanufacture:** To recondition to O.E.M. [original equipment manufacturer] Specifications. The component or system in question does not necessarily need to be replaced with an all new component, but may be replaced with a rebuilt component that meets "as new" OEM specifications, or, the used/old component may be removed and reconditioned itself to meet "as new" OEM specifications.

**Repair or Replacement — As Required or As Necessary:**

Repair or Replacement of components or subsystems "as required" or "as necessary" requires the contractor bring the part, component or subsystem back to new OEM functional specifications. If the part cannot be repaired and brought back up to OEM specifications it must be replaced. The part may be replaced with either a remanufactured or a new part.

Turning to the section of the contract labeled "Detailed Scope of Work," we note the following examples[1] of the types of work plaintiff was to perform: (1) remove

_____

[1] The "Detailed Scope of Work" section is several pages in length and we have only selected some examples of the types of work plaintiff was expected to perform in satisfaction of the contract.

engine/transmission cradle assembly, and inspect and clean the engine cradle; (2) thoroughly clean air intake system and replace particular parts with new parts; (3) thoroughly steam-clean engine compartment and replace particular parts with new parts; (4) inspect and service OEM fire alarm, check all hard tubing for cracks, dents, and poor solder connections, and replace sensors; (5) inspect and repair the driveshaft assembly to bring to new OEM condition, including rebuilding the propeller shaft with new universal joints, dust cap, and grease fittings; (6) remove, inspect, and clean the air tanks; (7) completely rebuild the air dryer to OEM specifications or replace with a new unit; (8) clean, inspect, and pressure test the radiator and charge air cooler assemblies; (9) remove and clean the front and rear axle assemblies and perform magnaflux or other Authority-approved nondestructive structural testing, and (a) return all front axle components to new OEM specifications, and (b) completely rebuild the differential carrier to new OEM specifications; and (10) rebuild the steering column using new U-joints, horn ring, contacts, tilt steering gears, and all levers, pins and bearings, but if rebuilding could not be preformed to OEM specifications, the steering column was to be replaced with a new one.

Clearly, the contract is not a contract merely for the purchase of bus parts. Rather, the contract provisions make several references, for example, to plaintiff's disassembling, removing, repairing, inspecting, reconditioning, rebuilding, replacing, restoring, painting, servicing, cleaning, testing, and reassembling various components and parts of the buses. Although replacement of certain bus parts was included in the remanufacturing contract, the purchase of bus parts was not an end in and of itself but a means, albeit a partial means, by which to fulfill the contractual objective of plaintiff's

customer to have its buses completely rehabilitated. That is, the sale of the bus parts was incidental to the service of actually performing the rehabilitation of the buses.

Second, we reviewed the SBTA, including the meaning of "business activity" because the SBT is a tax upon business activity. See *Trinova*, 433 Mich at 149. Under MCL 208.3(2), "[b]usiness activity" "means a transfer of legal or equitable title to or rental of property, whether real, personal, or mixed, tangible or intangible, or the performance of services, or a combination thereof, made or engaged in, or caused to be made or engaged in, within this state, whether in intrastate, interstate, or foreign commerce, with the object of gain, benefit, or advantage, whether direct or indirect, to the taxpayer or to others, but shall not include the services rendered by an employee to his employer, services as a director of a corporation, or a casual transaction."

In this case, it is arguable that even if the sale was a sale of tangible personal property—bus parts—there was "a transfer of legal or equitable title" to the bus parts when they were incorporated into the purchaser's bus, i.e., as each part was installed into the bus, each part was delivered to the purchaser and became an integrated component of the bus. See MCL 208.3(2), 208.52(b). And because each installation occurred in Michigan, each sale was "in this state." See *id*. That the completely rehabilitated buses were then delivered to out-of-state owners, in compliance with the remanufacturing contract, does not change the analysis. Thus, for purposes of the sales factor, the sale would be placed in the numerator whether it was a sale of tangible personal property or the sale of a service. MCL 208.51(1). The situation at issue here—remanufacturing—is not analogous to manufacturing a product as plaintiff had

argued in the Court of Claims. For example, when an automobile manufacturer installs a component part during the manufacture of a vehicle, it is installing the component into its own vehicle. Until it is sold, the automobile, as well as all of its component parts, are owned by the manufacturer. Here, plaintiff is installing its bus parts into used buses that plaintiff does not own. In any case, we conclude that the sale of the bus parts was merely incidental to the service of actually performing the rehabilitation of the buses and that the service was provided in Michigan.

Third, we considered the six-factor incidental-to-service factors set forth in *Catalina Mktg Sales Corp.* With regard to the first factor—what the buyer sought as the object of the transaction—we conclude that the buyer sought the service of having its buses rehabilitated. Plaintiff was to disassemble, remove, repair, inspect, recondition, rebuild, replace, restore, paint, service, clean, test, and reassemble various components and parts of the buses so they were, as the trial court described, "almost like new," or made to meet the standards of a newly manufactured bus. The object of the transaction was not merely to purchase "brand new bus parts" as plaintiff has argued.

With regard to the second factor—what the seller or service provider is in the business of doing—we note that plaintiff is in both the retail business of selling bus parts and the business of remanufacturing buses. However, with regard to the contract at issue, as well as similar types of contracts, plaintiff was not acting as a retailer of bus parts but was actually selling the service of rehabilitating buses, i.e., disassembling, removing, repairing, inspecting, reconditioning, rebuilding, re-

placing, restoring, painting, servicing, cleaning, testing, and reassembling various components and parts of the buses.

The third factor—whether the goods were provided as a retail enterprise with a profit-making motive—may be more applicable in the context of whether a retail sale is taxable under the General Sales Tax Act. But to the extent it is applicable here, we agree with the Court of Claims conclusion that, although the bus parts were available for purchase alone, in the context of a rehabilitation contract, the provision of the bus parts was merely a means to accomplish the contractual objective of rehabilitating the buses. In a sense, plaintiff was acting as a consumer of bus parts, not a retailer of bus parts. The same is true with regard to the fourth factor—whether the tangible goods were available for sale without the service. Plaintiff is in the business of selling bus parts, but it also sells rehabilitation services that require the installation of bus parts as well as the provision of other services to meet its contractual obligations.

Similarly, with regard to the fifth factor—the extent to which intangible services have contributed to the value of the physical item that is transferred—again, we agree with the Court of Claims conclusion that "there would be no remanufacturing but for the service." The value sought by plaintiff's remanufacturing customer includes all aspects of rehabilitation services, not just bus parts. As plaintiff admits, "capital grant funding is available for a rehabilitation project of a fleet of buses and is not available if the transit authority simple buys the parts and replaces them." And we agree with the Court of Claims' conclusion with regard to the sixth factor that no other factors are relevant to the particular transaction. Thus, the Court of Claims properly held that the remanufac-

turing contract at issue, as well as other remanufacturing contracts like it, are predominantly for the provision of a service and are allocated to Michigan, where the service was performed, under MCL 208.53. Accordingly, we affirm the grant of summary disposition in defendants' favor.

Next, plaintiff argues that defendants did not meet their burden of proof that revenue from remanufacturing projects was predominantly from services for projects completed in plaintiff's fiscal years ending in January 2002 through January 2005. But it appears that the Court of Claims, as well as the parties for at least some time, were operating under the understanding that the MBTA contract was representative of other remanufacturing contracts plaintiff was a party to in those years. However, in response to defendants' motion for summary disposition, plaintiff argued that some of the terms of those other contracts were not similar to the MBTA contract. At oral argument, the Court of Claims indicated that it would consider a motion for reconsideration with regard to fiscal years ending in January 2002 through January 2005 if plaintiff provided contracts that were significantly different from the MBTA contract. The Court of Claims also included that proviso in its order, granting plaintiff 21 days to file such a motion. Plaintiff did not file a motion for reconsideration. Accordingly, this issue was not properly preserved for our review. See *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008).

Next, plaintiff argues that it is entitled to an award of sanctions under MCR 2.313(C) because defendants failed to admit that plaintiff was entitled to a refund of SBT for the fiscal years ending in January of 2000 and 2001. A trial court's decision on a motion for sanctions

based on the failure to admit is reviewed for an abuse of discretion. See *Phinisee v Rogers*, 229 Mich App 547, 561-562; 582 NW2d 852 (1998).

Pursuant to MCR 2.312(A), a party in a civil case may request certain admissions from the other party before trial. And MCR 2.313(C) provides that "[i]f a party denies . . . the truth of a matter as requested under MCR 2.312, and if the party requesting the admission later proves . . . the truth of the matter, the requesting party may move for an order requiring the other party to pay the expenses incurred in making that proof, including attorney fees." Here, plaintiff requested such sanctions on the ground that defendants failed to admit that plaintiff's SBT returns filed for fiscal years ending in January of 2000 and 2001 were from the sale of bus parts entitling plaintiff to a refund. This was an allegation set forth in plaintiff's amended complaint. However, the parties voluntarily settled this matter before the hearing on the cross-motions for summary disposition and, obviously, before this case was summarily dismissed. Therefore, an award of sanctions under MCR 2.313(C) was not warranted.

In *Radtke v Miller, Canfield, Paddock & Stone*, 453 Mich 413; 551 NW2d 698 (1996), our Supreme Court explained that admissions under MCR 2.312 are more a matter of civil procedure because an admission conclusively establishes the admitted facts " 'and the opposing side need not introduce evidence to prove the facts.' " *Id*. at 420, quoting 2 Jones, Evidence (6th ed), § 13C:14, p 310 (November 1995 supp). "A request for admission is not a typical discovery device, however, because the purpose 'is not to discover facts but rather to establish some of the material facts in a case without the necessity of formal proof at trial . . . so that issues which are disputed might be clearly and succinctly presented to

the trier of facts.' " *Id.* at 420 n 6, quoting 23 Am Jur 2d, Depositions and Discovery, § 314, p 613. The *Radtke* Court further explained that these judicial admissions are formal concessions " 'that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.' " *Id.* at 420, quoting 2 McCormick, Evidence (4th ed), § 254, p 142. In this case, because the disputed issue was settled before final judicial disposition, plaintiff was not required to prove the allegation by further litigation and, therefore, was not entitled to "expenses incurred in making that proof" within the contemplation of MCR 2.313(C). Thus, the Court of Claims did not abuse its discretion when it denied plaintiff's request for sanctions under MCR 2.313(C).

Finally, plaintiff argues that "the United States' Constitution prohibits ruling upholding the department's assessments." Although unclear, it appears that plaintiff is claiming (1) a due process violation on the ground that it "has been forced to pay almost $80,000 in taxes and penalties pursuant to irrational and arbitrary assessments," and (2) a violation of the Commerce Clause apparently on the ground that defendants' interpretation of the relevant statutes created an internal and external inconsistency. These claims were not raised before, addressed, or decided by the Court of Claims; therefore, they are not properly preserved for appellate review and we decline to address them. See *Walters*, 481 Mich at 387.

Affirmed.